# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 09-1353
_____

Unseld Nance, Sr., individually                *
and as the natural father and next        *
friend of Unseld Nance, Jr.; Pamela    *
Farrow,                                                     *
                                                                 *
        Plaintiffs - Appellees,          *
                                                                 *
     v.                                                *
                                                                 *
                                                                 *
Erik Sammis, individually; Jimmy        *   Appeal from the United States
Evans, individually; William Johnson,  *   District court for the Eastern
individually; Robert Paudert,               *   District of Arkansas.
individually,                                          *
                                                                 *
        Defendants - Appellants,       *
                                                                 *
City of West Memphis, Arkansas;         *
Unknown Arkansas State Police          *
Officers, in their official capacity,       *
                                                                 *
        Defendants.                          *
                                                                 *
----------------------------------------           *
                                                                 *
Deborah Farrow, individually and as   *
co-administrator of the Estate of         *
DeAunta Farrow; Robin Perkins,          *
individually and as co-administrator of *
the Estate of DeAunta Farrow,            *
                                                                 *
        Plaintiffs - Appellees,          *

|  | * |
| v. | * |
|  | * |
| Erik Sammis, individually and in | * |
| official capacity as Officer of West | * |
| Memphis Police Department; Jimmy | * |
| Evans, individually; William Johnson, | * |
| individually; Robert Paudert, | * |
| individually, | * |
|  | * |
| Defendants - Appellants, | * |
|  | * |
| City of West Memphis, Arkansas, | * |
|  | * |
| Defendant. | * |

_____

Submitted: September 22, 2009
Filed: November 10, 2009

_____

Before MURPHY, JOHN R. GIBSON, and RILEY, Circuit Judges.

_____

MURPHY, Circuit Judge.

This case arises from the fatal shooting of DeAunta Farrow and seizure of Unseld Nance by two police officers in West Memphis, Arkansas. The families of Farrow and Nance brought this action under 42 U.S.C. § 1983 and state law against the two officers, as well as the chief of police, the mayor, and the city, alleging in particular excessive force and unreasonable seizure in violation of the Fourth Amendment. The district court[1] denied summary judgment to the officers on the basis

_____

[1] The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

-2-

of qualified immunity, but granted the summary judgment motions of the chief of police, the mayor, and the city.  The officers appeal, and we affirm.

I.

The West Memphis police department received information that after dark on June 22, 2007, two or three black males were going to rob a particular convenience store.  Seven members of the Special Response Team, including defendant officers Erik Sammis and Jimmy Evans, were ordered to conduct surveillance in the area of the convenience store.  Four were stationed in a vehicle one block south of the store, another was positioned across the street from the store, and officers Sammis and Evans were located about two blocks to the north.

Officers Sammis and Evans were parked in a dark gray, unmarked pickup truck in the parking lot of an apartment complex.  They were wearing camouflage pants, dark grey shirts, and black bulletproof vests.  The backs of their vests had the word "POLICE" written on them.  It was already dark, and the area surrounding the apartment complex was poorly lit.  At about 10:00 p.m. the officers noticed two black males, later identified as twelve year old DeAunta Farrow and fourteen year old Unseld Nance, walking toward the apartment complex.  Farrow was on the officers' right; Nance was on their left.

The parties disagree as to what happened next.  According to Nance, he and Farrow were walking to the apartment building to retrieve his cell phone.  Farrow had a toy gun tucked into the waistband of his pants.  The gun was gray with a black handle, and it had an orange cap at the tip of the barrel.  As the two boys neared the apartment building, they saw two men get out of a dark pickup truck.  The men pointed flashlights and guns at them and one shouted , "Get on the ground and drop the gun."  Nance immediately dropped to the ground, but Farrow remained standing.  Nance says the men did not identify themselves as police, nor did they have a visible

-3-

badge or patch to signify that they were law enforcement officers. The next thing he heard was a gunshot. He contends that Farrow was shot while "fixing to get on the ground" and while the toy gun was still tucked into his waistband. Nance does not recall hearing any warnings from the men before the shooting.

Officers Sammis and Evans report that as the boys approached, they saw something in Farrow's right hand that appeared to be a handgun. They got out of their truck with their guns drawn and flashlights on. Sammis claims that he shouted, "Police!" and ordered Farrow to drop his gun. Although Nance hit the ground immediately, both officers say Farrow remained standing and did not drop his weapon despite repeated commands to do so and that he raised his right hand while still holding the gun. Sammis then fired two rounds in rapid succession. Two shots hit Farrow.

Sammis told Evans to handcuff Nance while he bent over Farrow who was lying face down on the parking lot. Sammis says he asked Farrow if he had been hit and that he responded, "Yeah. It's only a toy gun." Sammis rolled Farrow to his side and found the toy gun underneath him at waist level. Appellees contend that it was still tucked into Farrow's waistband.

Evans contacted headquarters to report the shooting and the injuries to Farrow. The other members of the surveillance team hurried to the scene, and Evans relinquished control of Nance to the other officers. Sammis and Evans contend that they had custody of Nance for no more than 10 minutes and that he was still handcuffed when they turned him over. Nance asserts that he was handcuffed for almost 30 minutes at the scene of the shooting and while being transported to the police station. Paramedics attempted to stabilize Farrow once they arrived, but their efforts were unsuccessful and he died at the scene.

An Arkansas state police officer conducted a videotaped interview of Nance less than three hours after the shooting. During the interview, Nance stated that he and Farrow had been walking to their cousin's apartment when "two people got out of the car and pointed guns." They told Farrow and him to get on the ground and "to put the gun down." Nance reported that the two men did not identify themselves and that he had initially thought "they was people playing." Nance later stated that it had occurred to him that the men might be police officers because of how they shouted, but he repeatedly said that the men did not identify themselves and that he had not seen any police badge or patch on their clothing.

When asked about the gun, Nance demonstrated to the state police officer how Farrow had had the barrel of the toy gun tucked into his waistband while they walked to the apartment building. Nance reported that Farrow had been covering the handle of the gun with his right hand and that he never removed the gun from his waistband during their walk. Nance also showed the officer how Farrow had raised his hands up after they were ordered to get on the ground. It was unclear from his oral statement and demonstration whether Nance meant that Farrow had the gun in his hand at that point or whether it remained in his waistband.

At the conclusion of the interview, the state police officer drafted a summary statement for Nance to sign. It states in relevant part:

> De[A]unta was carrying with his right hand as we walked it was under his shirt with the handle showing. We saw 2 men get out of a black pickup truck by a dumpster they had two flashlights. Then one of them said get on the ground. I got on the ground De[A]unta was standing. His arms were partially raised up with the toy gun in his right hand. I was looking straight and didn't see the men. They said drop the gun. De[A]unta was fixing to get on the ground when they shot.

During his deposition, however, Nance testified that Farrow had still had the toy gun "tucked in his pants" at the time officer Sammis fired his weapon.

The medical examiner assigned to the case, Dr. Daniel Konzelman, testified that based upon the trajectory of the bullet wounds in Farrow's body, it was unlikely he had had both hands raised at the time he was shot. Dr. Konzelman also stated that the trajectory indicated that Farrow's left arm was not raised but that he could not determine the position of Farrow's right arm.

Nance's parents filed their action in the federal district court, individually and on behalf of their son, against officers Sammis and Evans, the chief of police, the mayor, and the city. They alleged violations of the First, Fourth, and Fourteenth Amendments, as well as various state law claims. Thereafter, Farrow's parents brought their action, individually and on behalf of the estate of their deceased son, against the same defendants alleging violations of the Fourth and Fourteenth Amendments and state law. The two cases were consolidated. All defendants moved for summary judgment with the individual defendants seeking qualified immunity.

The district court analyzed the excessive force and unreasonable seizure claims against officers Sammis and Evans under the Fourth Amendment, concluding that appellees had presented sufficient evidence for a reasonable jury to determine that the officers' actions violated clearly established constitutional rights of Nance and Farrow. The court determined that the pretrial record contained genuine issues of material fact as to "whether Farrow held a toy gun in his hand that could be mistaken for a real gun and [whether he] raised it toward Sammis, or if the toy gun was 'tucked in' Farrow's pants at the time Sammis fired his weapon." The district court concluded that these questions precluded qualified immunity on appellees' claims arising from the shooting. The officers now appeal those decisions.

The court concluded that the two officers could not however be held liable for the prolonged detention of Nance after he was turned over to others at the scene of the shooting. The court noted that, "[a]lthough the continued detention of Nance appears to have been unnecessary and unwarranted, plaintiffs have failed to name any

individual responsible for the detention."  The court granted qualified immunity to Sammis and Evans as to the continued detention and that has not been appealed.

Finding no basis for municipal liability, the district court granted summary judgment to the city.  The court also granted summary judgment to the chief of police and the mayor on the § 1983 claims, concluding that appellees provided insufficient evidence to support a finding of supervisor liability.  The chief of police and the mayor filed a petition to appeal if the district court's order were interpreted to permit any state law claims to survive against them, but no appeal was taken with respect to them.[2]

## II.

Qualified immunity protects government officials from liability under § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002).  The test for whether an officer is entitled to qualified immunity is twofold: (1) whether the facts alleged, taken in the light most favorable to the injured party, show that the officer's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful. Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009); Henderson v. Munn, 439 F.3d 497, 501-02 (8th Cir. 2006).  If no reasonable factfinder could answer yes to both of these questions, the

---

[2] The chief of police and the mayor worry that the district court's order would permit appellees to pursue state law claims against them.  We believe this is an inaccurate reading of the order.  Appellees have not made any factual allegations in their complaints, during summary judgment, or on appeal to suggest that they are pursuing state law claims against the mayor or the chief of police.  The only claims raised against them were under § 1983, and the district court granted summary judgment on them.  Based on the record we conclude that the chief of police and the mayor were properly dismissed.

officer is entitled to qualified immunity. See Plemmons v. Roberts, 439 F.3d 818, 822 (8th Cir. 2006).

We review a district court's denial of qualified immunity de novo, viewing the facts in the light most favorable to the nonmoving parties and drawing all reasonable inferences in their favor. Cavataio v. City of Bella Villa, 570 F.3d 1015, 1019 (8th Cir. 2009). Denial of qualified immunity will be affirmed if "a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful." Craighead, 399 F.3d at 960. We are prohibited from weighing evidence or making credibility determinations at this stage. Tlamka v. Serrell, 244 F.3d 628, 634 (8th Cir. 2001).

We first address officer Sammis' claim for qualified immunity with respect to appellees' excessive force and unreasonable seizure claims. All claims that law enforcement officers have used excessive force, whether deadly or not, in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 388 (1980). The key question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Craighead, 399 F.3d at 961. The reasonableness of an officer's use of force is evaluated by looking at the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight." Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009).

"Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Hassan v. City of Minneapolis, 489 F.3d 914, 919 (8th Cir. 2007). The use of deadly force is not constitutionally unreasonable if an officer has "probable cause to believe that the

suspect poses a threat of serious physical harm, either to the officer or others." Moore, 514 F.3d at 762. But where the suspect "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so" Craighead, 399 F.3d at 961.

Because a reasonableness review of the officers' conduct requires an examination of the sequence of events surrounding the shooting, we begin our analysis by examining the facts in the record. All parties agree that Nance immediately got to the ground when Sammis shouted his order and that Farrow remained standing. The issues of disputed fact include whether the officers identified themselves as police, whether they saw Farrow with a gun in his hand, whether they had reason to fear for their safety at the time of the shooting, and whether they gave warnings before using deadly force.

Both officers assert that Farrow disobeyed repeated orders from Sammis to drop his weapon and get to the ground. The officers contend that instead Farrow began to raise his arms toward the officers while holding the gun in his right hand. Sammis testified that he had yelled, "Police" at the outset of the encounter and that he shouted, "No!" before firing his weapon in the direction of Farrow and Nance. If the trier of fact believes the officers' version of the facts, they would have had probable cause to believe that Farrow posed "a threat of serious physical harm" to them and the use of deadly force in response could have been justified. Moore, 514 F.3d 762.

Nance, the only other living witness to the shooting, related a different set of facts. He testified that the weapon was just a toy gun, that it remained tucked in Farrow's waistband during the confrontation with the officers, and that Farrow was "fixing to get on the ground" at the time he was shot. Nance did not remember hearing officer Sammis yell, "Police" or "No!" prior to firing. In his interview with the state police Nance stated that Farrow had raised his hands before he was shot. Dr. Konzelman testified in his deposition that it was unlikely that Farrow was raising both

arms at the time he was shot, based upon the trajectory of the bullet wounds in his body.

Viewing the controverted record in the light most favorable to the nonmoving parties, as we are required to do at this stage, we must presume that the officers approached Farrow and Nance without identifying themselves as police officers, that the toy gun was tucked in Farrow's pants throughout the entire confrontation, that Sammis only said to drop the gun and get on the ground, and that Farrow may have raised his hand or hands while trying to get to the ground before Sammis shot him twice without warning. These facts taken in the light most favorable to appellees could establish the excessive use of force and unreasonable seizure in violation of Farrow and Nance's Fourth Amendment rights. Pearson, 129 S. Ct. at 815-16; Moore, 514 F.3d at 759.

Police officers are often forced to make split second judgments in circumstances that are "tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 397, and here Sammis and Evans were in the area to watch for armed suspects and they knew they might encounter a dangerous situation. That alone would not permit the use of deadly force, however. If the factfinder were to determine that Farrow raised a handgun towards them and appeared ready to shoot, the use of deadly force could have been objectively reasonable. Since the surrounding factual circumstances are in dispute, material questions of fact prevent granting summary judgment on the basis of qualified immunity.

Officer Sammis contends that the case law is not sufficiently established on a right to be free from the use of deadly force "where the suspect has in his possession a toy weapon that appears to be real and the suspect does not comply with the officers' commands." For a constitutional right to be clearly established, there does not have to be a previous case with exactly the same factual issues. Hope, 536 U.S. at 739. Although the question must be a particularized inquiry "in light of the specific context

of the case," <u>Samuelson v. City of New Ulm</u>, 455 F.3d 871, 875 (8th Cir. 2006), "[g]eneral statements of the law are capable of giving clear and fair warnings to officers even where the very" circumstances confronting the officers has not previously been addressed. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

The right to be "free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." <u>Samuelson</u>, 455 F.3d at 877. There is extensive case law setting forth the requirement that an officer must have "probable cause to believe that the suspect poses a threat of serious physical harm" before using deadly force. <u>See</u> <u>Craighead</u>, 399 F.3d at 962 (collecting cases that put officers on notice that they may not use deadly force under circumstances in which "they should know that the suspect does not present an immediate threat of serious physical injury or harm"). The right of Farrow and Nance to be free from the use of deadly force was clearly established in June 2007. Existing case law would have made it sufficiently clear to a reasonable officer that a suspect cannot be apprehended by use of deadly force unless that individual poses a threat of serious physical harm.

Officer Evans was also denied qualified immunity in the district court on the issue of excessive force and unreasonable seizure. The claims against Evans are based not only on the use of excessive force but also the failure to prevent its use. Appellees' complaints alleged that officer Evans "made no efforts to prevent the Defendant Sammis from violating the rights" of Farrow and Nance. We have previously recognized that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office" by failing to act to prevent the use of excessive force. <u>Putnam v. Gerloff</u>, 639 F.2d 415, 423 (8th Cir. 1981). As of June 2007, it was clearly established that an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment. <u>Krout v. Goemmer</u>, 2009 WL 3172180, at *5 (8th Cir. Oct. 6, 2009) (finding case law clearly established on this constitutional right as

of July 2006).  Other circuits have also recognized the failure to intervene as a basis for liability under a Fourth Amendment excessive force claim.  See, e.g. Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 51-52 (1st Cir. 2005); Priester v. City of Riviera Beach, 208 F.3d 919, 924-25 (11th Cir. 2000); Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996).

In a representative case, the Sixth Circuit rejected an officer's argument for qualified immunity on an excessive force claim on the basis that he had not personally participated in the use of deadly force which injured the plaintiff.  Floyd v. City of Detroit, 518 F.3d 398, 406 (6th Cir. 2008).  As the court explained,

> A police officer who *fails* to act to prevent the use of excessive force may still be held liable where (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

Id. (emphasis in original).  The officer had "participated in the tactical decision that he and [his partner] would confront Floyd in the latter's backyard with their guns drawn, without any verbal warning." Id. at 407.  The officer had failed to protect the plaintiff, and the fact that he was not the shooter did not absolve him of his responsibility.  Id.

Here, Evans confronted the boys with his gun drawn in a poorly lit parking lot. Evans did not identify himself or Sammis as law enforcement officers and admits that he failed to give any warning as to the possible use of deadly force or try to stop Sammis from shooting.  Evans' failure to take action to deescalate the situation if he had an opportunity and means to do so could establish liability.  Floyd, 518 F.3d at 406; Ngo v. Storlie, 495 F.3d 597, 603 (8th Cir. 2007) (holding qualified immunity inappropriate where "a warning . . . was feasible and the failure to take an extra moment to assess the situation" added to the unreasonableness of the officer's

-12-

actions). Without impermissible factual determinations of exactly what occurred that evening, we cannot conclude at this stage that Evans is entitled to qualified immunity.

The Nance appellees base their unreasonable seizure claim not only on the use of deadly force, but also on the officers' act of handcuffing Nance following the shooting. While genuine issues of material fact exist with respect to the objective reasonableness of the use of deadly force, we cannot say the same with respect to the handcuffing of Nance. Even if we accept Nance's description of the facts, we could not conclude that it was unreasonable for Sammis and Evans to handcuff him at the scene of the shooting, whether it was for ten or thirty minutes. At that point the officers did not know if Nance was armed or whether he and Farrow should be considered possible suspects in the anticipated convenience store robbery. Moreover, the parties agree that Sammis and Evans turned Nance over to other officers as soon as they arrived.

## III.

Significant factual disputes remain with respect to the shooting of DeAunta Farrow and seizure of Unseld Nance. The current record did not conclusively establish whether the actions of officers Sammis and Evans were objectively reasonable. We therefore affirm the ruling of the district court denying the officers summary judgment.

_____