# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3193

_____

S.L., a minor, by next friend Ron Lenderman

*Plaintiff - Appellee*

v.

St. Louis Metropolitan Police Department Board of Police Commissioners;
Richard Gray, Vice President; Bettye Battle-Turner, President; Michael L.
Gerdine, Treasurer; Francis G. Slay, Ex-Officio Member; Daniel W. Isom, Chief
of Police; Reggie L. Harris; Lathan Isshawn-O'Quinn

*Defendant - Appellant*s

Antoinette Filla; Henrietta Arnold

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 12, 2013
Filed: August 5, 2013

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

S.L. brought this 42 U.S.C. § 1983 action against several St. Louis police officers for arresting her on false charges and conspiring to hide it. She also brought municipal liability claims for deliberate indifference and inadequate supervision. The district court[1] denied qualified immunity to the officers responsible for the false arrest and to Lieutenant Colonel Reggie Harris and Sergeant Lathan Isshawn-O'Quinn for involvement in covering up the arrest. It also denied summary judgment to the St. Louis Metropolitan Police Department Board of Police Commissioners ("Board") on S.L.'s municipal liability claims. Isshawn-O'Quinn, Harris, and the municipal defendants appeal. We affirm the denial of qualified immunity to the two officers and dismiss the Board's appeal for lack of jurisdiction.

I.

Officer Susie Lorthridge and Lieutenant Henrietta Arnold were St. Louis Metropolitan Police Department (SLMPD) officers assigned to the eighth district. During the July 3, 2010 workday Officer Lorthridge drove Lieutenant Arnold home to pick up some medication. There, Arnold was surprised to discover her son's girlfriend, S.L., in his bedroom. She ordered S.L. out of the house and warned her, "[I]f somebody doesn't come and get you in five minutes, then I'm going to call your parents. And if they don't answer, then I'm going to take you to jail."

When S.L. was unable to find a ride home, Officer Lorthridge suggested to Lieutenant Arnold that they arrest her. Arnold initially expressed some concern, but Lorthridge assured her that an arrest would be lawful because S.L. had been trespassing. Lorthridge then handcuffed S.L., and the two officers took her to the police station. S.L. testified that during the ride to the station, Arnold called her a "white bitch" and stated she would like to "slit [S.L.'s] throat." S.L. also heard

---

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

Arnold make a call on her cell phone, reporting that she and Lorthridge had "a problem, but when we get there, we'll talk to you about it." It seemed to S.L. that Arnold was talking to a superior officer. Since Lieutenant Arnold was the highest ranking officer in her own district at that time, S.L. later concluded that the call must have been made to Lieutenant Colonel Reggie Harris, the head of SLMPD's internal affairs unit.

At the police station S.L. was given a "city court summons" ordering her to appear in court on trespassing charges on September 1, 2012. She was then placed in a holding cell for about an hour. When an officer visited the cell to inquire why S.L. was there, S.L. told her, "I was just seeing my boyfriend, . . . [Lieutenant Arnold's] son, and she arrested me for trespassing." According to S.L. the officer replied, "Are you serious?" and shook her head. Another officer later removed S.L. from the cell and took her to a second police station. There, S.L. was placed in a cell "with about six or seven other girls" for "about four or five hours" before an officer informed her that she was free to leave. S.L. then told that officer about her arrest and stated that she "really d[id]n't believe that [she] did anything wrong." She asked for his advice, and the officer told her that she should raise her concerns at her scheduled court hearing. No information was given to S.L. about the right to counsel or how she might contact a lawyer.

SLMPD procedures require an arresting officer to submit an incident report within 48 hours of making an arrest. S.L. was arrested on July 3, and Lorthridge submitted her first report about the arrest the next day. It was rejected without comment by an eighth district sergeant. On July 5 a new sergeant, Isshawn-O'Quinn, was assigned to the eighth district. Lorthridge gave him a second draft of the arrest report that morning and told him that it "need[ed] to be looked at."

Isshawn-O'Quinn rejected Lorthridge's second report based on several deficiencies. He pointed out that among other things the report had been submitted

in the wrong name, did not identify the district in which the arrest had occurred, and failed to include the information that an "assisting officer" had been present during the arrest. Lorthridge then produced two more draft reports for consideration by Isshawn-O'Quinn, both of which he rejected. In the fourth draft Lorthridge named Arnold for the first time as an officer assisting in the arrest. Isshawn-O'Quinn advised Lorthridge to remove Arnold's name because she had been on limited administrative duty at the time of the arrest and therefore lacked authority to participate in S.L.'s arrest.[2] He explained to Lorthridge, "That puts the department in a bad situation if she's out there taking police actions. I just couldn't do that." Isshawn-O'Quinn also informed Lorthridge that he could not approve the report without a named witness to the arrest. He instructed her to look in the SLMPD computer system for a name and to "be creative."

Lorthridge submitted a fifth draft of the arrest report on July 6. It omitted any assisting officer and included false statements about the fabricated offense. S.L.'s trespass was set in a new location and an eyewitness was included. The report indicated that S.L. had been arrested for "trespassing on private property" after she was found "walking in the area . . . appear[ing] to be extremely unke[m]pt, as she was not wearing shoes and her hair was scattered about her head." According to this draft of the report, the victim of the trespass was Riverway Development, LLC, which was said to have previously asked S.L. "repeatedly . . . not to trespass on [its] property." Riverway Development had actually owned a vacant lot adjacent to Arnold's property, but it was no longer in operation there at the time of S.L.'s arrest.

The arrest report also named an intersection within the St. Louis city limits as the location of the arrest, while Arnold's property where it had actually occurred was

---

[2]Arnold had been placed on limited administrative duty after being "involved in a vehicle accident during normal working hours while shopping . . . and improperly using a St. Louis Metropolitan Police Department vehicle."

just beyond the city limits and outside of SLMPD jurisdiction. Finally, the report inserted the name of Richard Delaney, termed a Riverway Development employee, as a witness to the trespass. Delaney was an Indiana resident whose name had been found in the police department's computer system after Isshawn-O'Quinn suggested that Lorthridge "be creative" in finding one there. Delaney's name was in the computer system because he had been involved in a minor car accident in St. Louis in 2007. He had never returned to Missouri after that and had never been employed by Riverway Development which no longer operated at the site of the imaginary trespass. One half hour after Lorthridge submitted the fifth arrest report, Isshawn-O'Quinn reviewed it and gave it his approval.

Shortly thereafter, Captain William Swiderski of the eighth district heard "a rumor floating around the patrol station" that Arnold had arrested her son's girlfriend for trespassing. He reviewed the fifth draft of Lorthridge's incident report and noticed that it did not mention Arnold's involvement. The captain also found it problematic that the police report charged S.L. with trespass for being on a public intersection. After consulting with others in the department, he filed an employee misconduct report and commenced an internal affairs investigation. Arnold, Lorthridge, and S.L. were interviewed between August and October of 2010. Arnold made several false statements during her interview, including denying that her son had been involved with S.L., stating that she had not participated in S.L.'s arrest, and insisting that the arrest had occurred on the vacant lot neighboring her property. Police also interviewed Richard Delaney, the alleged witness and resident of Indiana, who confirmed that he had not visited St. Louis since his car accident in the city three years before.

As the head of the SLMPD internal affairs division, Colonel Harris received periodic updates on the investigation involving Lieutenant Henrietta Arnold. The record contains no evidence as to the content of these updates. S.L. alleges, however, that Harris received confidential information about the investigation which he then

shared with Arnold. She points to police records showing that Lorthridge and Arnold had both searched in the SLMPD computer system for references to Richard Delaney shortly after he was interviewed as part of the confidential internal police investigation in August 2011. S.L. contends that Lorthridge and Arnold would not have searched for Delaney's name unless they had been informed about his recent interview by internal police investigators, and that neither would have known about it unless Harris had leaked the information to Arnold. The record also contains some evidence of a close relationship between Colonel Harris and Lieutenant Arnold, including his deposition testimony that he had recommended that Arnold "be promoted to the rank of lieutenant," and Arnold's testimony that she considered Harris a mentor and that he had previously visited her home and kissed her.

One week after Arnold's first interview with internal investigators, her son Jonathan visited S.L. at her parents' home to encourage her to change her story to the police. S.L. testified that Jonathan told her "that his mom was going to lose her job if I didn't lie and say that I wasn't arrested at their house." S.L.'s father testified that he overheard that conversation between Jonathan and S.L. and that Jonathan had similarly warned him that "if [S.L.] doesn't change that story, my mom is going to lose her job." According to S.L., she told Jonathan, "I'm not going to change the truth . . . . I don't feel that I should have to lie for [Arnold], because she was in the wrong and I wasn't."

After S.L.'s parents left for work the following day, Jonathan again began pressuring her to change her story. She refused, and an argument escalated until Jonathan threw S.L. to the floor and choked her. S.L. attempted to flee through the front door, but Jonathan grabbed her by the hair. S.L. had learned a month earlier that she was pregnant with Jonathan's child, and she protested, "You're hurting me . . . . You're not supposed to put your hands on me. I'm about to have a baby." Jonathan continued to choke and hit S.L., threw her against a washer/dryer, and left the house. S.L. called the police, and an ambulance took her to the hospital. There she was

diagnosed with a punctured lung, air around the heart, severe bruising, and severe emotional distress.

The internal affairs investigation continued, and the Summary Hearing Board ultimately disciplined both Lieutenant Arnold and Sergeant Isshawn-O'Quinn. Officer Lorthridge voluntarily resigned from the SLMPD. At Isshawn-O'Quinn's hearing in March 2011, the Board found that he had failed to supervise Lorthridge adequately. According to the Board, Isshawn-O'Quinn should also have inquired further into Arnold's role in the arrest, which would have revealed that the arrest occurred in her home outside SLMPD jurisdiction and that the arrestee was the girlfriend of Arnold's son. The Board also concluded that Isshawn-O'Quinn had "failed to review the supporting documents to the police report, including the summons," thereby violating the department's requirement that he "review all documentation . . . to make sure they appeared legitimate and appropriate." Isshawn-O'Quinn received a one day suspension and a written reprimand from the Board.

Meanwhile Lieutenant Arnold had been suspended without pay in December 2010 for false reporting charges, but her hearing did not take place until August 2011. At that hearing the Board considered testimony from S.L. and several SLMPD officers. The Board then determined that Arnold had participated in the arrest of S.L. without probable cause, in the creation of a false incident report, in altering the location of an arrest to place it within the city of St. Louis, and in making false statements during the internal affairs investigation. Arnold was found to have brought discredit on the department, and her employment was terminated.

The Board did not make any findings with respect to Colonel Harris, the nature of his relationship with Arnold, or any role he may have had in covering up the arrest. He was also never interviewed by the SLMPD's internal affairs division of which he

was the head. Harris's testimony was not sought until S.L. filed this § 1983 action alleging that he had participated in the cover up of her unlawful arrest.

## II.

S.L. filed this action under 42 U.S.C. § 1983 alleging that her arrest by Lorthridge and Arnold, and the cover up of that arrest by Harris and Isshawn-O'Quinn, had violated her constitutional rights. She claimed that Arnold and Lorthridge had violated her Fourth Amendment rights by making a false arrest and that Lieutenant Isshawn-O'Quinn had participated in the violation by suggesting and approving a falsified incident report. S.L. also alleged that the four police officers had conspired to cover up a false arrest in violation of § 1983. She claimed that Arnold, Lorthridge, Isshawn-O'Quinn, and Harris had violated her Fourteenth Amendment rights "to due process, property, equal protection under the law, and equal justice" by "conspir[ing] together and with others, including the son of Defendant Arnold, and reach[ing] a mutual understanding to undertake a course of conduct that violated [S.L.'s] civil rights."

S.L. also brought municipal liability claims against the Board and certain officers in their official capacities. She claimed that the Board had been deliberately indifferent to pervasive unlawful arrests and false reporting in the SLMPD, and that Colonel Harris, Chief of Police Isom, Lieutenant Colonel Anoinette Filla, and the Board were liable for inadequate supervision of Lorthridge, Arnold, and Isshawn-O'Quinn. According to S.L., Lieutenant Colonel Filla had learned of her false arrest and then "knowingly allowed the matter to be assigned [to] the Internal Affairs Division rather than immediately suspend[ing]" the arresting officers, which amounted to inadequate supervision.

The individual officers moved for summary judgment on qualified immunity grounds. The Board, Harris, Isom, and Filla also moved for summary judgment on

the ground that S.L. had not presented sufficient evidence to demonstrate that the Board had been deliberately indifferent to false reporting or that any of the defendants were liable for inadequate supervision.

The district court granted summary judgment to Isshawn-O'Quinn on S.L.'s Fourth Amendment claim. It reasoned that he had not participated in the unlawful arrest of S.L. because a seizure is "a single act, and not a continuous fact," citing Thompson v. Whitman, 85 U.S. 457, 471 (1873), and Isshawn-O'Quinn had not been "present at the scene of [S.L.'s] arrest and did not learn of the arrest until two days later." The district court also granted summary judgment to Lieutenant Colonel Filla on S.L.'s inadequate supervision claim, concluding that "[t]here is no evidence that Filla . . . should have known that proceeding with a formal complaint would result in harm to [S.L.]."

Summary judgment was denied on all other claims. As relevant to this appeal, the district court concluded that Arnold, Lorthridge, Isshawn-O'Quinn, and Harris were not entitled to qualified immunity on the § 1983 conspiracy charge because there was "evidence of intentional conduct designed to conceal a violation of [S.L.'s] constitutional rights and . . . influence the outcome of the investigation." It concluded with respect to municipal liability that a reasonable jury could find on evidence in the record that the Board had been deliberately indifferent to widespread false arrests by SLMPD officers and that the Board, Harris, and Isom had failed to supervise Arnold, Lorthridge, and Isshawn-O'Quinn adequately.

Isshawn-O'Quinn, Harris, Isom, and the Board then filed this interlocutory appeal. Isshawn-O'Quinn and Harris argue that the district court erred in denying them qualified immunity because conspiring to cover up an already completed

constitutional violation does not violate § 1983.[3] The Board, Isom, and Harris appeal the district court's denial of summary judgment on S.L.'s municipal liability claims, urging us to exercise pendent jurisdiction over these issues because they are inextricably intertwined with the question of qualified immunity. Arnold and Lorthridge do not appeal the district court's denial of qualified immunity as to them.

III.

Isshawn-O'Quinn and Harris challenge the district court's denial of qualified immunity to them on S.L.'s conspiracy claim. State officials enjoy qualified immunity from a § 1983 action if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is appropriate only if "no reasonable factfinder" could determine that (1) the facts viewed in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right, and (2) the constitutional right was "clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful." Nance v. Sammis, 586 F.3d 604, 609 (8th Cir. 2009).

The district court denied qualified immunity to Isshawn-O'Quinn and Harris after determining that a reasonable jury could find on evidence in the record "that Lorthridge and Isshawn-O'Quinn conspired to conceal Arnold's role in the arrest[] and that Harris conspired with Arnold to keep her informed of the course of the [internal affairs] investigation." It then observed that a § 1983 conspiracy claim "can proceed on an allegation of a cover-up designed to deprive [S.L.] of a valid § 1983 claim" arising from Arnold and Lorthridge's misconduct. The district court concluded that

---

[3]Harris and Isshawn-O'Quinn also challenge the sufficiency and admissibility of S.L.'s proffered evidence linking them to any conspiracy, but that is collateral to the question before the court. See Johnson v. Jones, 515 U.S. 304, 314 (1995).

S.L. had provided sufficient evidence for a jury to find that Isshawn-O'Quinn and Harris "conspired to deprive her of her constitutional rights."

We review de novo the district court's denial of qualified immunity to Isshawn-O'Quinn and Harris, "viewing the facts in the light most favorable to [S.L.] and drawing all reasonable inferences in [her] favor." Nance, 586 F.3d at 609. On appeal we review only questions of law and not "a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial." Johnson, 515 U.S. at 314. We therefore accept the district court's determination of what facts were "sufficiently supported for purposes of summary judgment." Lockridge v. Bd. of Trs. of Univ. of Ark., 315 F.3d 1005, 1008 (8th Cir. 2003) (en banc) (citation omitted). Our review is limited to whether the alleged conduct "violated the plaintiff's clearly established federal rights." Id.

A.

In reviewing the district court's denial of qualified immunity to Isshawn-O'Quinn and Harris, we consider first whether its findings and the factual record support a conclusion that the officers violated S.L.'s constitutional rights. See Lockridge, 315 F.3d at 1008. S.L. alleges that Harris and Isshawn-O'Quinn conspired to violate her constitutional rights in violation of § 1983. To succeed on her § 1983 conspiracy claim, S.L. must show that (1) Harris and Isshawn-O'Quinn conspired to deprive her of a constitutional or federal right, (2) "at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy," and (3) S.L. was injured by that overt act. Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999).

As to the first element, we agree with the district court that S.L. had a constitutional right to bring a § 1983 action for her false arrest and detention by Arnold and Lorthridge. "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government," Sure-Tan, Inc. v.

NLRB, 467 U.S. 883, 896–97 (1984), which our court has recognized as a "fundamental right of every citizen," Gunter v. Morrison, 497 F.3d 868, 874 (8th Cir. 2007) (citation omitted). Individuals who have been falsely arrested are therefore "entitled to 'free and unhampered access to the courts'" to pursue § 1983 actions. Id. (quoting Harrison v. Springdale Water & Sewer Comm'n, 780 F.2d 1422, 1427–28 (8th Cir. 1986)). In this case it was particularly important that S.L. be able to pursue her § 1983 action because that statute was enacted "to protect the people from unconstitutional action under color of state law," Mitchum v. Foster, 407 U.S. 225, 242 (1972), and to "deter state actors" such as Arnold and Lorthridge "from using the badge of their authority to deprive individuals of their federally guaranteed rights," Wyatt v. Cole, 504 U.S. 158, 161 (1992).[4]

To complete our analysis of the first element, we consider whether the record supports a conclusion that Harris and Isshawn-O'Quinn conspired with Arnold and Lorthridge to deprive S.L. of her valid § 1983 claim. We conclude that it does. As to Isshawn-O'Quinn, the district court determined that a reasonable jury could find from the evidence that he and Lorthridge had "conspired to conceal Arnold's role in the arrest[]," and we accept that determination at this stage. See Lockridge, 315 F.3d at 1008. Other evidence in the record also tends to support Isshawn-O'Quinn's involvement in the alleged conspiracy. He encouraged Lorthridge to "be creative" in providing an imaginary witness to S.L.'s arrest by searching for a name in the department's computer system. He also instructed her to remove Arnold's name as

---

[4]The dissent relies on a pro se case with national security implications, Christopher v. Harbury, 536 U.S. 403 (2002), arguing that S.L. has stated neither a "backward-looking" nor "forward-looking" claim for access to courts. Our court has never interpreted Harbury to require this type of categorization, however, and the Supreme Court itself emphasized that "[b]ifurcation into forward-looking and backward-looking access claims is a simplification," rather than "the only possible categorization." Id. at 414 n.11. Moreover, while the plaintiff in Harbury was actively pursuing simultaneous tort claims for her injuries in that case, id. at 422, S.L. has no alternative cause of action against Harris and Isshawn-O'Quinn.

assisting officer. After Lorthridge implemented his suggestions, Isshawn-O'Quinn accepted and approved the fifth incident report without inquiring about the changes or alerting any superior officer about the creative reporting. Isshawn-O'Quinn's deposition testimony establishes that his approval was sufficient for the falsified arrest report to escape review by any other supervising officer.

With respect to Harris, the district court similarly determined that the record was sufficient for a reasonable jury to find that he had "conspired with Arnold to keep her informed of the course of the [internal affairs] investigation." The record contains evidence that Harris and Arnold had a close professional relationship, that he had advocated for her promotion, and that she considered him a mentor. Arnold indicated that in August 2009 Harris had visited her home and kissed her, and that "[a] couple of months later" he had kissed her again at work. There is also evidence that Arnold and Lorthridge searched in the SLMPD computer system for information about Richard Delaney after he was interviewed by the internal affairs division. Harris oversaw that division and had access to confidential information about Delaney's interview. Viewing the record in the light most favorable to S.L. as we must, a "reasonable inference[]" could be made that confidential information about the internal affairs investigation was shared with Arnold by Harris. Nance, 586 F.3d at 609. The record at this stage is sufficient not to dismiss S.L.'s claim that Harris and Isshawn-O'Quinn conspired with others to conceal facts on which a legal action for false arrest and detention could be based.

Turning to the second element, the record also contains evidence that "at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy." Askew, 191 F.3d at 957. Isshawn-O'Quinn instructed Lorthridge to "be creative" in repairing deficiencies in her arrest report, and he accepted the revised incident report without inquiring as to its striking inconsistencies with previous drafts. The evidence similarly supports an inference that Harris leaked information to Arnold about the ongoing investigation, including informing her when Richard

-13-

Delaney was being interviewed. Alleged conspiracy members Arnold and Lorthridge also engaged in overt acts by submitting the falsified arrest report and misleading the investigators during the internal affairs investigation. These facts would be sufficient to establish an overt act in furtherance of the conspiracy.

Finally as to the third element, the record at this stage has support for S.L.'s claim of injury by an overt act of the conspiracy. Isshawn-O'Quinn reviewed and approved the falsified arrest documents related to S.L.'s arrest, including a summons for a city court hearing. S.L.'s father testified in his deposition that after viewing the summons he told her that "it looks like you're going to court, and we're going to need a lawyer." The lawyer retained by S.L. ultimately recommended filing this § 1983 action rather than appearing for the scheduled hearing. Isshawn-O'Quinn's approval of the summons therefore injured S.L. by requiring her to retain defense counsel related to the trespassing charge. There is also no evidence at this point about whether the trespassing charge was ever expunged from S.L.'s record or whether she has been deterred from seeking employment based on the false arrest report.

While there is no direct evidence that Arnold instructed her son Jonathan to coerce S.L. to change her story, the record shows that he began pressuring S.L. to change her story one week after Arnold was interviewed by investigators. When S.L. refused, Jonathan choked and beat her to the point of causing a punctured lung, air around her heart, and bruising. S.L.'s father testified that her hospital bills from that assault were about $10,000 and that she did not have health insurance. Approximately $8,000 of the bills remain unpaid. Circumstantial evidence therefore links S.L.'s physical and economic injuries to Arnold's overt acts, see Westborough Mall, Inc. v. City of Cape Girardeau, 693 F.2d 733, 743 (8th Cir. 1982), which are in turn related to Harris's acts of providing her with information about the internal affairs investigation so she could protect her own interests.

Finally, S.L. testified that the arrest and cover up caused her to be "deathly afraid of police officers" and that when she encounters one she "get[s] really, really upset and cr[ies]." She also stated, "I'm just depressed and don't feel that I can motivate myself like the same way that I used to. I just felt like I was . . . the target for no reason at all. I don't understand, I guess, why all of that happened." Such evidence could support a finding that S.L. was injured as a result of Lorthridge's overt act of filing the false police report and Isshawn-O'Quinn's act of approving it.

The dissent argues that S.L. is not entitled to bring a § 1983 action against Harris and Isshawn-O'Quinn because she may bring claims against Arnold, Lorthridge, and others to recover for her injuries. The fact that S.L. may bring a separate action against other actors involved in a prior constitutional violation, however, does not provide adequate redress for her injuries arising from the misconduct of Harris and Isshawn-O'Quinn. The "very purpose of § 1983 [is] to interpose the federal courts between the States and the people . . . [and] to protect the people from unconstitutional action under color of state law." Mitchum, 407 U.S. at 242. There is supporting evidence that Harris and Isshawn-O'Quinn deliberately falsified arrest records to protect the department's reputation following Arnold and Lorthridge's abusive misconduct. In such circumstances S.L. has the right to bring a § 1983 action against them for unlawfully covering up a constitutional violation.

We conclude that the record, when viewed in the light most favorable to S.L., would be sufficient for a reasonable factfinder to find that Harris and Isshawn-O'Quinn participated in a § 1983 conspiracy to violate her constitutional rights.

## B.

We turn next to the question of whether S.L.'s constitutional rights are clearly established such that Harris and Isshawn-O'Quinn would understand that their

conduct was unlawful. The Supreme Court has long held that "civil rights actions are of 'fundamental importance . . . in our constitutional scheme' because they directly protect our most valued rights," Bounds v. Smith, 430 U.S. 817, 828 (1977) (citations omitted), and has observed that it was through the enactment of § 1983 that "the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established," Mitchum, 407 U.S. at 238–39. Our court has similarly suggested that "intentional" police misconduct "ar[ising] from a conspiracy" would violate a plaintiff's clearly established constitutional rights. Mettler v. Whitledge, 165 F.3d 1197, 1206 (8th Cir. 1999). We conclude that conspiring to prevent a plaintiff from bringing a viable § 1983 action by covering up a false arrest therefore may amount to a violation of a clearly established right.

In the particular circumstances of this case, Harris and Isshawn-O'Quinn also had reason to know that their conduct violated S.L.'s constitutional rights. Isshawn-O'Quinn instructed Lorthridge to "be creative" in revising the incident report documenting S.L.'s arrest. After Lorthridge resubmitted a revised report, he approved it without inquiring into the inconsistencies, thereby preventing any other officers from scrutinizing its content. The record at this stage similarly supports an inference that Colonel Harris, the head of SLMPD's internal affairs division, informed Arnold about the internal investigation into her misconduct. A reasonable factfinder could determine that an officer overseeing such a unit, which was part of the SLMPD's bureau of professional standards, would know that divulging confidential information to the subject of an investigation is improper. In a situation where a supervising officer has "intentional[ly]" aided a subordinate office in concealing the circumstances surrounding an improper arrest, Mettler, 165 F.3d at 1206, that officer has reason to "understand his conduct was unlawful" and in violation of the arrestee's constitutional rights, Nance, 586 F.3d at 609.

Our conclusion is also consistent with the "obvious function" of qualified immunity, which is to "excuse an officer who makes a reasonable mistake in the

-16-

exercise of his official duties" but not one who "intentionally abuse[s] a person's known rights." Edwards v. Baer, 863 F.2d 606, 607 (8th Cir. 1988). A reasonable officer would be aware that it is impermissible to assist in falsifying an arrest report or hinder an investigation into the underlying misconduct. Nor is this a circumstance in which officers unwittingly accepted a falsified arrest report or disclosed details of an investigation. Rather, Isshawn-O'Quinn instructed Lorthridge to fabricate portions of the report, resulting in her inserting a false witness, false place of arrest, and false incident summary. He then approved the modified report without question or comment. Drawing "reasonable inferences in [S.L.'s] favor," Nance, 586 F.3d at 609, the record similarly supports that Harris disclosed confidential information to Arnold in order to assist her in concealing facts sought by investigators.

We conclude that the material facts identified by the district court and the record viewed in the light most favorable to S.L. would support a conclusion that Harris and Isshawn-O'Quinn conspired with Arnold and Lorthridge to prevent S.L. from filing a § 1983 action following her false arrest, which amounted to participation in a § 1983 conspiracy. The record at this stage is sufficient for a reasonable jury to find that Harris and Isshawn-O'Quinn violated S.L.'s clearly established constitutional rights, and the district court accordingly did not err in denying qualified immunity to them.

IV.

The district court's denial of summary judgment on S.L.'s municipal liability claims is also appealed. The Board appeals the district court's denial of summary judgment on S.L.'s claim that it was deliberately indifferent to a pattern of unconstitutional conduct by the SLMPD. The Board, Chief of Police Isom, and Harris appeal the denial of summary judgment on S.L.'s inadequate supervision charge. We generally lack jurisdiction "to hear an immediate appeal from a district court's order denying summary judgment, because such an order is not a final

-17-

decision." Krout v. Goemmer, 583 F.3d 557, 563–64 (8th Cir. 2009). We will exercise pendent appeal jurisdiction over such an appeal only in the "exceptional circumstance" in which it is "inextricably intertwined" with the qualified immunity appeal, which occurs when the resolution of the qualified immunity claim "necessarily resolves the pendent claims as well." Lockridge, 315 F.3d at 1012 (citation omitted).

We conclude that the municipal liability claims are not "inextricably intertwined" with the qualified immunity appeal and we thus lack jurisdiction to consider them at this stage. Id. Granting qualified immunity to Harris and Isshawn-O'Quinn would not determine whether the Board was deliberately indifferent to any pattern of false arrests in St. Louis. To establish a custom or practice by the Board of ignoring false arrests by the SLMPD, S.L. must show (1) the existence of a widespread pattern of unconstitutional misconduct by the department, (2) deliberate indifference to that conduct by the Board, and (3) that S.L. was injured by the misconduct. Ware v. Jackson Cnty., Mo., 150 F.3d 873, 880 (8th Cir. 1998).

The misconduct alleged by S.L. to show the Board's deliberate indifference differs from her proffered facts supporting denial of qualified immunity to Harris and Isshawn-O'Quinn. The deliberate indifference claim relies largely on allegations related to the structure and decisions of the Board itself. S.L. alleges, for example, that the Board received no information about the frequency of false arrests in St. Louis and was unaware of any SLMPD practices or procedures following a false arrest allegation. S.L. also need not prove liability of any individual municipal employee to succeed on her deliberate indifference claim because the Board may be liable if "the combined actions of multiple officials" created a pattern of unconstitutional conduct which could not be individually attributed to any one officer. Speer v. City of Wynne, 276 F.3d 980, 986 (8th Cir. 2002).

Nor would a grant of qualified immunity to Harris and Isshawn-O'Quinn "necessarily resolve[]" S.L.'s claim that the Board, Isom, and Harris failed to supervise Arnold, Lorthridge, and Isshawn-O'Quinn. Lockridge, 315 F.3d at 1012. To establish liability for failure to supervise, S.L. must show "deliberate indifference [to] or tacit authorization of the offensive acts." Brockinton v. City of Sherwood, 503 F.3d 667, 673 (8th Cir. 2007) (citation omitted). With respect to the Board and Chief of Police Isom, this issue "requires entirely different analys[i]s" from the question of qualified immunity, Veneklase v. City of Fargo, 78 F.3d 1264, 1270 (8th Cir. 1996), because it would require examination of SLMPD supervision and training policies rather than the actions of individual officers, see Tilson v. Forrest City Police Dep't, 28 F.3d 802, 812–13 (8th Cir. 1994).

Granting qualified immunity to Harris also would not resolve S.L.'s failure to supervise claim against him. Harris is entitled to qualified immunity if his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow, 457 U.S. at 818, but he may be liable for failure to supervise even without having "personally participated in any constitutional deprivation" or "know[ing] about any violation at the time it occurred," Wever v. Lincoln Cnty., Neb., 388 F.3d 601, 606 (8th Cir. 2004) (citation omitted). The issues raised by the municipal defendants are thus not inextricably intertwined with the question of qualified immunity, and we lack jurisdiction to consider them at this time.

## V.

Accordingly, we affirm the district court's denial of qualified immunity to Colonel Harris and Sergeant Isshawn-O'Quinn, and we dismiss the appeal by the SLMPD Board of Police Commissioners, Chief of Police Isom, and Colonel Harris on S.L.'s municipal liability claims for lack of jurisdiction.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts I, II, and IV of the court's opinion.  Because S.L.'s complaint does not support a denial-of-access claim, I respectfully dissent as to Parts III and V (in part).

In *Scheeler v. City of St. Cloud, Minn.*, we said that the "right of access to the courts is well-established" in this circuit and concluded that a police department's failure to properly investigate a crime could result in the denial of a person's meaningful access to the courts.  402 F.3d 826, 830 (8th Cir. 2005) (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)).  In *Scheeler*, the plaintiffs claimed that the defendant police officers' failure to investigate properly the death of their son caused a loss of evidence that precluded them from pursuing "a wrongful death action . . . against the individual that killed [their son]."  *Id.* at 829 (quoting the complaint).  We recognized the denial-of-access claim as properly stated but affirmed summary judgment in favor of the defendants, determining that the plaintiffs failed to make the required showing that the defendants displayed "deliberate indifference to their right of access to the courts."  *Id.* at 831.

Prior to our decision in *Scheeler*, the Supreme Court explained the allegations that a plaintiff must make to pursue a constitutional denial-of-access claim.  *See Harbury*, 536 U.S. 403.  In *Harbury*, the plaintiff alleged that her husband, a Guatemalan rebel leader, was captured by Guatemalan army forces that included officers trained in the United States and retained as informants by the Central Intelligence Agency ("CIA").  *Id.* at 406.  Eventually, Harbury's husband was executed by order of the CIA-affiliated officers.  *Id.*  According to Harbury's complaint, White House and State Department officials intentionally misled her regarding her husband's whereabouts, preventing her from filing a lawsuit against the United States that could have saved her husband's life.  *Id.* at 409-10.  In a *Bivens*

-20-

action, Harbury alleged that various federal officials "unconstitutionally impeded her access to the courts." *Id*. at 408-10.

In reviewing Harbury's claim, the Supreme Court divided denial-of-access claims into two categories. *Id*. at 412-14. First are forward-looking claims, in which "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Id.* at 413. In these cases, "[t]he opportunity has not been lost for all time . . . the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* Typical cases include prisoners seeking to use a prison's law library, or "cases challenging filing fees that poor plaintiffs cannot afford to pay." *Id.* Second are "backward-looking" claims, in which "[t]he official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Id.* at 413-14 (citations omitted).

> These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, *in providing relief obtainable in no other suit in the future*.

*Id.* at 414 (emphasis added) (footnotes omitted). Thus, in backward-looking claims, the complaint must identify a "remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.* at 415. "There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.*

-21-

The Supreme Court determined that Harbury alleged a backward-looking claim and that her complaint "did not come even close to stating a constitutional claim for denial of access upon which relief could be granted." *Id.* at 418. It reasoned that "the complaint failed to identify the underlying cause of action that the alleged deception had compromised, going no further than the protean allegation that the State Department and [National Security Council] defendants' 'false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress.'" *Id.* More importantly for our purposes here, even if the Supreme Court accepted Harbury's allegation at oral argument that she would have filed a claim for intentional infliction of emotional distress, "she could not satisfy the requirement that a backward-looking denial-of-access claim provide a remedy that could not be obtained on an existing claim." *Id.* at 420-21. The Supreme Court reasoned that the plaintiff's complaint already included a claim for intentional infliction of emotional distress and that she could seek damages through that cause of action. *Id* at 421.

In sum, *Harbury* requires a backward-looking denial-of-access claim to state a remedy that is unavailable in a current or future lawsuit. *See id.* at 415; *see also Steidl v. Fermon*, 494 F.3d 623, 633 (7th Cir. 2007); *Broudy v. Mather*, 460 F.3d 106, 117-18 (D.C. Cir. 2006); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1207-09 (10th Cir. 2004). In *Scheeler*, the plaintiff stated this element by pleading that the underlying violation—a failure to investigate—deprived them of the evidence needed to pursue a civil lawsuit. *See* 402 F.3d at 829. Here, however, S.L. makes no such allegation.

In Count IV of S.L.'s amended complaint, she alleges that Arnold, Lorthridge, Officer Harris, and Officer Isshawn-O'Quinn conspired to "violate [her] civil rights by unlawfully seizing her person, detaining her, and creating a false report to cover up the unlawful arrest." The complaint further alleges that the conspiracy "deprived [her of] her rights under the Fourth and Fourteenth Amendments to the United States

Constitution." S.L., then, does not make a "forward-looking" claim because she does not allege that "systemic official action frustrates [her] in preparing and filing suits at the present time." *Harbury*, 536 U.S. at 413. Rather, she claims the "loss of an opportunity to seek some particular order of relief," *id.* at 414, by alleging that Officers Harris and Isshawn O'Quinn conspired to "creat[e] a false police report to cover up the unlawful arrest and detention."

Applying *Harbury* to S.L.'s complaint, I conclude that S.L. fails to state a constitutional claim for denial of access because Count IV of the complaint does not seek "relief obtainable in no other suit in the future." *Id*. at 414. The remedy S.L. seeks through Count IV—damages and other appropriate relief resulting from a deprivation of her Fourth and Fourteenth Amendment rights—is the very same remedy she seeks through Count I. *Compare* Compl. ¶ 73 (alleging that the conspiracy "deprived [her] of her rights under the Fourth and Fourteenth Amendments to the United States Constitution") *with* Compl. ¶ 49 (alleging that Arnold and Lorthridge "subjected [her] to an unlawful and unjustified search and seizure . . . in violation of the Fourth and Fourteenth Amendments"). This is virtually the same scenario the Supreme Court confronted when it rejected the plaintiff's denial-of-access claim in *Harbury*. *See Harbury*, 536 U.S. at 421-22. Unlike the plaintiff in *Scheeler*, S.L. does not allege that the coverup led to a loss of evidence that will prejudice her cause of action for the unlawful search and seizure. I cannot discern how Count IV would provide her with a remedy unavailable through the prosecution of Count I.

Moreover, even the court's speculative attempt to identify injuries caused by the alleged conspiracy fails to identify a unique remedy that could support a denial-of-access claim. The court states that S.L. suffered injury from the alleged conspiracy to cover up her arrest because she was required to retain a lawyer to represent her at a city court hearing related to the false arrest. The court additionally concludes that S.L. suffered injury from the alleged coverup when Arnold's son Jonathan choked

-23-

and beat her. In both cases, S.L. may seek redress for the injury in "some suit that may yet be brought." *Id.* at 415. The cost of hiring an attorney arises from the unlawful search and seizure and may be recovered through S.L.'s § 1983 claim against Arnold and Lorthridge. And while Jonathan's alleged assault of S.L. is reprehensible, S.L. could seek relief for the injuries Jonathan inflicted upon her through her claims against Arnold or through a primary tort suit against Jonathan. Again, S.L.'s complaint contains no allegation that the alleged coverup somehow prejudiced her current ability to bring such a suit.

The court ignores *Harbury*, except to point out that its bifurcation of denial of access claims "'into forward-looking and backward-looking access claims is a simplification,' rather than 'the only possible categorization.'" *Ante* at 12 n.4 (quoting *Harbury*, 536 U.S. at 414 n.11). This observation by the Supreme Court does not affect *Harbury*'s central holding. In any case where a plaintiff alleges that an official's past action denied her access to the courts, her complaint "should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Harbury*, 536 U.S. at 417-18 (footnote omitted). Whether or not we call it a backward-looking claim, S.L.'s denial of access claim fails to meet the pleading standard required by Rule 8(a) and *Harbury*. Moreover, it is of no moment under the reasoning of *Harbury* that S.L. "has no alternative cause of action against Harris and Isshawn-O'Quinn," *ante* at 12 n.4, because the dispositive question is whether the *remedy* sought from them is obtainable elsewhere.[5] As discussed above, S.L. identifies no

_____

[5] Indeed, the denial-of-access claim that the Supreme Court rejected in *Harbury* was directed at different defendants than the underlying claim for intentional infliction of emotional distress. *See Harbury*, 536 U.S. at 409 (describing Harbury's denial-of-access counts as naming National Security Council and State Department officials as defendants); *id.* at 419 n.17, 421 n.20 (noting that the intentional-infliction-of-emotional-distress counts underlying the denial-of-access claim named

-24-

injury apart from those compensable in her underlying claims against Arnold, Lorthridge, and, potentially, Jonathan. In short, S.L. fails to describe any *remedy* available under the access claim and presently unique to it.

I do not suggest as a general matter that S.L. could not bring a § 1983 action against Officers Harris and Isshawn-O'Quinn merely due to "[t]he fact that S.L. may bring a separate action against other actors involved in a prior constitutional violation." *Ante* at 15. The problem is that she fails to plead the necessary elements of a claim against those officers. If the record viewed in the light most favorable to S.L. indicated that Officers Harris and Isshawn-O'Quinn violated a clearly established constitutional right, S.L. would indeed be entitled to bring a claim under § 1983, irrespective of her claims against Arnold and Lorthridge. But the record does not so indicate. The only constitutional violation the court identifies as involving Officers Harris and Isshawn-O'Quinn arises from their alleged conspiracy "to deprive S.L. of her valid § 1983 claim." *Ante* at 12. As discussed above, a denial-of-access claim requires the plaintiff to identify a remedy uniquely available through the claim, and S.L.'s allegations in that regard are insufficient. This fact, combined with her failure to identify any other constitutional injury arising from Officer Harris's and Officer Isshawn-O'Quinn's alleged conduct, leads to her inability to identify the "unconstitutional action under color of state law" that is required to survive summary judgment against the officers. *Id.* at 15 (quoting *Mitchum*, 407 U.S. 225, 242 (1972)).

The alleged conduct of Officers Harris and Isshawn-O'Quinn is inexcusable. Nevertheless, though their actions were "unprofessional, [S.L. has] failed to demonstrate that that conduct constituted a constitutional violation." *King v. Olmsted Cnty.*, 117 F.3d 1065, 1068 (8th Cir. 1997); *see also Rubek v. Barnhart*, 814 F.2d 1283, 1285 (8th Cir. 1987) ("While we deplore the action complained of if the [plaintiffs'] allegations are true, it is well established that not every violation of state

CIA officials as defendants).

tort or criminal assault laws committed by a state official results in a constitutional violation cognizable under section 1983."). Because S.L.'s complaint does not identify a "remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought," *Harbury*, 536 U.S. at 415, her allegations do not support a denial-of-access claim. It follows that S.L.'s complaint fails to establish that Officers Harris and O'Quinn violated her constitutional rights. *See Steidl*, 494 F.3d at 633 (reversing the denial of qualified immunity on a denial-of-access claim and holding that the plaintiff failed to establish a constitutional violation because his complaint did "not ask[] for any remedy relating to the denial of access to the courts that he [could not] 'still . . . obtain [] through another procedure'" (quoting *Harbury*, 536 U.S. at 415) (third and fourth alterations in original)). I therefore conclude that Officers Harris and Isshawn-O'Quinn are entitled to qualified immunity and would reverse the district court's holding to the contrary.

———————————————