COLLOTON, Circuit Judge.
 

 The Association of Equipment Manufacturers and four farm equipment manufacturers asked the district court
 
 [1]
 
 to enjoin North Dakota Senate Bill 2289, which regulates relationships between manufacturers and farm equipment dealers. The district court granted a preliminary injunction on the ground that the Act likely violated rights of the manufacturers under the Contract Clause of the Constitution, U.S. Const. art. I, § 10, cl. 1. The State of North Dakota and an intervenor, the North Dakota Implement Dealers Association, appeal that order. We affirm.
 

 I.
 

 Senate Bill 2289 is an Act "to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair."
 
 See
 
 2017 N.D. Laws, ch. 354 (codified at
 
 N.D. Cent. Code §§ 51-07-01.2
 
 , 51-07-02.2, 51-26-06 (2017)). The legislation contains three sections. The first section applies "[n]otwithstanding the terms of any contract," and prohibits manufacturers from imposing various contractual obligations on farm equipment dealers.
 
 See
 

 id.
 

 sec. 1 (
 
 N.D. Cent. Code § 51-07-01.2
 
 , § 1). Manufacturers, for example, cannot require dealers to maintain exclusive facilities, "unreasonably" refuse to approve the relocation of dealerships, or impose "unreasonable" performance standards on dealers.
 

 Id.
 

 sec. 1 (
 
 N.D. Cent. Code § 51-07-01.2
 
 , § 1.e, .i, .k).
 

 The second section regulates dealership transfers and permits a dealer to transfer a dealership agreement after notice to the manufacturer and approval of the manufacturer. Certain denials by manufacturers are presumed unreasonable, and the section allows a dealer to file an action challenging a manufacturer's denial.
 

 Id.
 

 sec. 2. A third section imposes several new requirements on manufacturers with respect to reimbursements that they must provide to dealers for warranty repairs.
 

 Id.
 

 sec. 3. Although the last two sections do not contain language specifying retroactive application, the State does not dispute the district court's conclusion that they apply to existing contracts, and the State generically describes SB 2289 as "retroactive."
 
 Cf.
 

 Smith v. Baumgartner
 
 ,
 
 665 N.W.2d 12
 
 , 14-16 (N.D. 2003).
 

 The manufacturers sued and raised claims under several constitutional and statutory provisions, including the Contract Clause and the Federal Arbitration Act. The district court entered a preliminary injunction against enforcement of SB 2289, concluding that the manufacturers were likely to succeed on the merits of their Contract Clause claim and that the other relevant factors weighed in favor of a preliminary injunction.
 
 See
 

 Dataphase Sys., Inc. v. C L Sys., Inc.
 
 ,
 
 640 F.2d 109
 
 (8th Cir. 1981) (en banc). The court reasoned that SB 2289 imposed unforeseeable new regulations on existing contracts that amounted to substantial impairments. Citing the statement of a co-sponsor in the legislature that the bill was designed to create a "level playing field" for implement
 dealers, the court determined that the Act was special-interest legislation unsupported by a significant and legitimate public purpose. The court also ruled that SB 2289's retroactive "No Arbitration" provision, which says that a manufacturer generally may not require a dealer to agree to arbitration,
 
 see
 
 2017 N.D. Laws, ch. 354, sec. 1 (
 
 N.D. Cent. Code § 51-07-01.2
 
 , § 1.l), was preempted by the Federal Arbitration Act,
 
 9 U.S.C. § 2
 
 .
 

 The State appeals the district court's order, disputing the conclusion that the manufacturers are likely to succeed on the merits of their Contract Clause claim. An order granting a preliminary injunction is reviewed for abuse of discretion.
 
 TCF Nat'l Bank v. Bernanke
 
 ,
 
 643 F.3d 1158
 
 , 1162 (8th Cir. 2011).
 

 II.
 

 In determining whether a state law passes muster under the Contract Clause, "[t]he threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.' "
 
 Sveen v. Melin
 
 , --- U.S. ----,
 
 138 S. Ct. 1815
 
 , 1821-22,
 
 201 L.Ed.2d 180
 
 (2018) (quoting
 
 Allied Structural Steel Co. v. Spannaus
 
 ,
 
 438 U.S. 234
 
 , 244,
 
 98 S.Ct. 2716
 
 ,
 
 57 L.Ed.2d 727
 
 (1978) ). If the answer is yes, then the court asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.' "
 
 Id.
 
 at 1822 (quoting
 
 Energy Reserves Grp., Inc. v. Kan. Power & Light Co.
 
 ,
 
 459 U.S. 400
 
 , 411-12,
 
 103 S.Ct. 697
 
 ,
 
 74 L.Ed.2d 569
 
 (1983) ). "The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act."
 
 Equip. Mfrs. Inst. v. Janklow
 
 ,
 
 300 F.3d 842
 
 , 859 (8th Cir. 2002) ;
 
 see also
 

 Energy Reserves Grp.
 
 ,
 
 459 U.S. at 411-12
 
 ,
 
 103 S.Ct. 697
 
 . If the State shows a significant public purpose and is not a contracting party, then "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."
 
 Energy Reserves Grp.
 
 ,
 
 459 U.S. at 412-13
 
 ,
 
 103 S.Ct. 697
 
 (quoting
 
 U.S. Tr. Co. of N.Y. v. New Jersey
 
 ,
 
 431 U.S. 1
 
 , 23,
 
 97 S.Ct. 1505
 
 ,
 
 52 L.Ed.2d 92
 
 (1977) ).
 

 The State contends that SB 2289, although retroactive, does not "substantially impair" the manufacturers' contractual rights. This court, distilling the jurisprudence on substantial impairment, has concluded that the governing rule is akin to a question of reasonable foreseeability: "if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed."
 
 Holiday Inns Franchising, Inc. v. Branstad
 
 ,
 
 29 F.3d 383
 
 , 385 (8th Cir. 1994).
 

 We conclude that the manufacturers in this case "cannot reasonably be said to have had a fair and appreciable warning of an impending intervention into their agreements."
 

 Id.
 

 Several provisions regulating dealer agreements are new additions to the North Dakota Century Code or significantly expand existing provisions.
 
 See
 
 2017 N.D. Laws, ch. 354, sec. 1 (
 
 N.D. Cent. Code § 51-07-01.2
 
 , § 1.d, .e, .h, .i, .j, .k, .l), sec. 3. Previous regulations, moreover, forbade primarily coercive and discriminatory practices; for example, a manufacturer could not "[c]oerce or attempt to coerce" a dealer into accepting delivery of equipment the dealer had not voluntarily ordered.
 
 See
 
 1991 N.D. Laws, ch. 521, sec. 1. SB 2289, by contrast, includes several amended and new provisions that forbid manufacturers from "requir[ing]" dealers to take certain actions, "[n]otwithstanding the terms of any contract."
 
 See
 
 2017 N.D. Laws, ch. 354, sec. 1 (
 
 N.D. Cent. Code § 51-07-01.2
 
 , § 1.a, .c, .d, .e, .h, .l). The law thus goes a significant step beyond regulation of coercive
 and discriminatory practices by rendering unenforceable obligations that dealers previously accepted as part of freely negotiated contracts.
 
 See
 

 Equip. Mfrs. Inst.
 
 ,
 
 300 F.3d at 858-59
 
 . The new law also substantially enlarged the regulation of dealer reimbursements that had been limited to rules about reimbursement for labor.
 
 See
 
 2017 N.D. Laws, ch. 354, sec. 3 (
 
 N.D. Cent. Code § 51-26-06
 
 , §§ 1, 2 (regulating reimbursement for transportation services, diagnostic work, repair service, warranty work compensation, product improvement programs, maintenance plans, extended warranties, and certified preowned warranties)).
 

 This court previously held that a similar retroactive law governing agreements between farm equipment dealers and manufacturers in South Dakota violated the Contract Clause.
 
 See
 

 Equip. Mfrs. Inst.
 
 ,
 
 300 F.3d at 848-49, 859-62
 
 . Some provisions of the North Dakota law parallel the South Dakota statute by expanding prohibitions on coercion to regulate existing contracts, and the manufacturers were entitled to rely on the South Dakota precedent when considering what legislative impairments were reasonably foreseeable.
 
 See
 

 Holiday Inns Franchising
 
 ,
 
 29 F.3d at 385
 
 . For all of these reasons, SB 2289 substantially impairs obligations of contract.
 

 The State's primary argument is that even if SB 2289 substantially impairs the manufacturers' contractual rights, the legislation reasonably advances a significant and legitimate public purpose, so the impairment is constitutional. In
 
 Equipment Manufacturers Institute
 
 , South Dakota conceded that the purpose of a similar law was "to level the playing field between manufacturers and dealers,"
 
 300 F.3d at 860
 
 , and this court concluded that the conceded purpose did not qualify as a "significant and legitimate public interest."
 

 Id.
 

 at 861
 
 . North Dakota makes no such concession and asserts that this law furthers a significant public interest in serving farmers and rural communities. But the mere assertion of a conceivable public purpose is insufficient to justify a substantial impairment of contractual rights. Virtually all legislation enacted by multi-member bodies will be motivated by multiple purposes in the minds of individual legislators, but those subjective intentions are not controlling. Whether the law passes constitutional muster requires a more discerning inquiry into the Act's structure and design.
 

 As a matter of the text and original meaning of the Contract Clause, there seems to be little doubt that the North Dakota law would be unconstitutional. The Clause's terms are absolute: "No State shall ... pass any ... Law impairing the Obligation of Contracts ...." U.S. Const. art. I, § 10, cl. 1. The Clause's principal target was debtor-relief legislation that many States had passed in the wake of the Revolutionary War,
 
 see
 

 Sveen
 
 ,
 
 138 S. Ct. at 1821
 
 , but the text is not so limited, and historical context suggests that the Clause was "aimed at all retrospective, redistributive schemes in violation of vested contractual rights." Douglas W. Kmiec & John O. McGinnis,
 
 The Contract Clause: A Return to the Original Understanding
 
 ,
 
 14 Hastings Const. L.Q. 525
 
 , 533-34 (1987). The Supreme Court, through Chief Justice Marshall, understood the Framers "to have intended to establish a great principle, that contracts should be inviolable," and concluded in an early case construing the Clause that the Court "should give these words their full and obvious meaning."
 
 Sturges v. Crowninshield
 
 , 17 U.S. (4 Wheat.) 122, 205-06,
 
 4 L.Ed. 529
 
 (1819). Even where a state statute was designed to further a legitimate state purpose of assisting poor people who were oppressed by debts, the Contract Clause forbade legislation
 that discharged contractual liability without performance.
 
 See
 

 id.
 

 at 206 ; Kmiec & McGinnis,
 
 supra
 
 , at 536-37. The Clause did not prevent a State from regulating health, safety, and morals,
 
 see
 

 Stone v. Mississippi
 
 ,
 
 101 U.S. 814
 
 , 817-19,
 
 25 L.Ed. 1079
 
 (1880), but drew the line at efforts "to redistribute resources in violation of vested contractual rights." Kmiec & McGinnis,
 
 supra
 
 , at 541 ;
 
 see also
 
 Richard A. Epstein,
 
 Toward a Revitalization of the Contract Clause
 
 ,
 
 51 U. Chi. L. Rev. 703
 
 , 715-16, 730-40 (1984) (arguing that while the Contract Clause encompasses a modest police power limitation, "the transfer of wealth by special-interest politics" is the "evil to which the clause is directed").
 

 Modern jurisprudence, however, has taken a different course. The Court in
 
 Home Building &Loan Association v. Blaisdell
 
 ,
 
 290 U.S. 398
 
 ,
 
 54 S.Ct. 231
 
 ,
 
 78 L.Ed. 413
 
 (1934), disavowed that "what the Constitution meant at the time of its adoption it means to-day," or that "the great clauses of the Constitution must be confined to the interpretation which the framers ... would have placed upon them."
 

 Id.
 

 at 442-43
 
 ,
 
 54 S.Ct. 231
 
 .
 
 Blaisdell
 
 upheld Minnesota's mortgage moratorium law, a form of debtor-relief legislation, against a challenge under the Contract Clause.
 

 Id.
 

 at 447-48
 
 ,
 
 54 S.Ct. 231
 
 . Yet
 
 Blaisdell
 
 did not rest on a mere assertion of conceivable public purpose; the Court cited legislative findings, supported by an adequate factual basis, that documented the existence of an economic emergency.
 

 Id.
 

 at 421 n.3, 444-45,
 
 54 S.Ct. 231
 
 ;
 
 see also
 

 Keystone Bituminous Coal Ass'n v. DeBenedictis
 
 ,
 
 480 U.S. 470
 
 , 486 & n.14,
 
 107 S.Ct. 1232
 
 ,
 
 94 L.Ed.2d 472
 
 (1987) (upholding state statute where "the legislative purposes set forth in the statute were genuine, substantial, and legitimate").
 

 Since
 
 Blaisdell
 
 , the Court has reaffirmed that the Contract Clause prohibits special-interest redistributive laws, even if the legislation might have a conceivable or incidental public purpose.
 
 Allied Structural
 
 involved a Minnesota law that sought to protect pension benefits for those who worked for a specific class of employers.
 
 See
 

 438 U.S. at 238
 
 ,
 
 98 S.Ct. 2716
 
 . A three-judge district court had "no trouble concluding" that the statute addressed "a problem of vital public interest," namely, "protecting the economic welfare of its senior citizens by assuring the receipt of earned pension benefits as a form of retirement income."
 
 Fleck v. Spannaus
 
 ,
 
 449 F. Supp. 644
 
 , 650-51 (D. Minn. 1977). But the Supreme Court reversed, observing that the law had "an extremely narrow focus" because it applied only to certain employers.
 
 Allied Structural
 
 ,
 
 438 U.S. at 248
 
 ,
 
 98 S.Ct. 2716
 
 . The Court ruled that the statute could "hardly be characterized, like the law at issue in the
 
 Blaisdell
 
 case, as one enacted to protect a broad societal interest."
 

 Id.
 

 at 248-49
 
 ,
 
 98 S.Ct. 2716
 
 . As such, the Minnesota law was unconstitutional.
 

 On the other hand, in
 
 Energy Reserves Group
 
 , there was "little doubt about the legitimate public purpose behind" a Kansas law that imposed price controls for natural gas.
 
 459 U.S. at 417
 
 ,
 
 103 S.Ct. 697
 
 . Because the public utility defending the law already could pass through any price increase to its customers, the price controls promised lower prices for consumers, and the public utility would not benefit significantly.
 
 See
 

 id.
 

 at 405 n.3, 407 n.6, 418 n.25,
 
 103 S.Ct. 697
 
 ;
 
 see also
 
 Brief for Appellee at 4-5 & n.12,
 
 Energy Reserves Grp.
 
 ,
 
 459 U.S. 400
 
 (No. 81-1370). Under those circumstances, the Court deemed the statute a valid exercise of the State's "police power to protect consumers from the escalation of natural gas prices caused by deregulation."
 
 459 U.S. at 416-17
 
 ,
 
 103 S.Ct. 697
 
 . In short, the inherent pro-consumer
 nature of the Kansas law and the pre-existing pass-through mechanism made it self-evident to the Court that the law had a broad public purpose and was not special-interest legislation.
 

 So too in
 
 Exxon Corp. v. Eagerton
 
 ,
 
 462 U.S. 176
 
 ,
 
 103 S.Ct. 2296
 
 ,
 
 76 L.Ed.2d 497
 
 (1983), where a state law prohibited oil and gas producers from passing on a severance tax increase to consumers. The Court reasoned that the statute "imposed a generally applicable rule of conduct designed to advance 'a broad societal interest,' " namely, "protecting consumers from excessive prices."
 

 Id.
 

 at 191
 
 ,
 
 103 S.Ct. 2296
 
 (quoting
 
 Allied Structural
 
 ,
 
 438 U.S. at 249
 
 ,
 
 98 S.Ct. 2716
 
 ). The effect on contracts "was incidental to its main effect of shielding consumers from the burden of the tax increase."
 
 Id.
 
 at 191-92,
 
 103 S.Ct. 2296
 
 .
 

 Exxon
 
 did contrast a statute that permissibly imposed "a generally applicable rule of conduct" with an unconstitutional enactment whose "sole effect was to alter contractual duties"-
 
 i.e.
 
 , one that applied only to existing contracts.
 

 Id.
 

 at 192
 
 ,
 
 103 S.Ct. 2296
 
 . But the Court did not say that
 
 only
 
 laws in the latter category can transgress the Contract Clause.
 
 Cf. post
 
 , at 738. If that were so, then this court's decision in
 
 Equipment Manufacturers Institute
 
 would have come out the other way, because the South Dakota law at issue there imposed generally applicable rules for both pre-existing and future dealership agreements.
 
 300 F.3d at 848-49
 
 . This court has thus rejected the view that retroactive legislation is
 
 always
 
 permissible under the Contract Clause "so long as the state takes the simple precaution of having its legislation apply
 
 in futuro
 
 as well."
 
 See
 
 Epstein,
 
 supra
 
 , at 739. Even where a law does not have the
 
 sole
 
 effect of altering pre-existing contractual duties, "[t]he State must show that the regulation protects a 'broad societal interest rather than a narrow class.' "
 
 Equip. Mfrs. Inst.
 
 ,
 
 300 F.3d at 859
 
 (quoting
 
 Allied Structural
 
 ,
 
 438 U.S. at 249
 
 ,
 
 98 S.Ct. 2716
 
 ).
 

 In evaluating the present North Dakota law governing contracts between manufacturers and dealers, the State "bears the burden of proof in showing a significant and legitimate public purpose underlying the Act."
 
 Id.
 
 at 859. The state legislature declined to follow the examples of the legislatures in
 
 Blaisdell
 
 and
 
 Keystone Bituminous
 
 , which included well-supported findings or purposes within their duly enacted laws, so any significant and legitimate public purpose must be discerned from the design and operation of the legislation itself. Statements in the legislative history of individual legislators, lobbyists, or advocates that the law would benefit farmers and rural communities are insufficient. Special-interest groups cannot establish that legislation serves a broad societal interest simply by ensuring that the record contains testimony or floor statements about a law's conceivable public benefits.
 

 Unlike the statutes at issue in
 
 Energy Reserves Group
 
 and
 
 Exxon
 
 , this North Dakota legislation does not self-evidently further a significant and legitimate public purpose. "[A] state must do more than mouth the vocabulary of the public weal in order to reach safe harbor,"
 
 McGrath v. R.I. Ret. Bd.
 
 ,
 
 88 F.3d 12
 
 , 16 (1st Cir. 1996), and here the State did not even utter it. The Act nowhere mentions benefits for farmers or rural communities, and it has a narrow focus: restricting the contractual rights of farm equipment manufacturers. The law primarily benefits a particular economic actor in the farm economy-farm equipment dealers. Even if the law indirectly might benefit farmers and rural communities, the Contract Clause demands more than incidental public benefits. "The requirement of a legitimate public purpose guarantees that the State is
 exercising its police power, rather than providing a benefit to special interests."
 
 Energy Reserves Grp.
 
 ,
 
 459 U.S. at 412
 
 ,
 
 103 S.Ct. 697
 
 . The design of this North Dakota legislation fails to provide the requisite guarantee.
 

 Accepting the State's assertion of a sufficient public purpose without a stronger showing would come perilously close to upholding an impairment of contractual obligations based merely on a rational basis-
 
 i.e.
 
 , a rational relationship between the new regulation and a legitimate governmental purpose. Under current doctrine, once a State is deemed to have shown a "significant and legitimate public purpose" for retroactive legislation, the court considers whether the law is drawn in an "appropriate" and "reasonable" way to advance that purpose.
 
 Sveen
 
 ,
 
 138 S. Ct. at 1822
 
 . At this last step, the Supreme Court has directed courts to defer to the legislative judgment as to necessity and reasonableness, "as is customary in reviewing economic and social regulation."
 
 Energy Reserves Grp.
 
 ,
 
 459 U.S. at 412-13
 
 ,
 
 103 S.Ct. 697
 
 (internal quotation and brackets omitted). Yet the Court also has made clear that the Contract Clause provides greater protection for contractual rights than the "less searching" rational basis standard applied under the Due Process Clauses.
 
 See
 

 Pension Benefit Guar. Corp. v. R.A. Gray & Co.
 
 ,
 
 467 U.S. 717
 
 , 733,
 
 104 S.Ct. 2709
 
 ,
 
 81 L.Ed.2d 601
 
 (1984). To avoid collapsing the specific prohibition of the Contract Clause into the more general Due Process Clause, a reviewing court must require the State to demonstrate more than a conceivable or incidental public purpose for impairing the obligation of contracts.
 
 [2]
 

 * * *
 

 For these reasons, the State has not carried its burden of showing a significant and legitimate public purpose underlying Senate Bill 2289. The district court thus did not err in concluding that the manufacturers were likely to succeed on the merits of their Contract Clause claim. The State does not challenge the scope of the preliminary injunction, so the question whether it should be limited to retroactive applications of SB 2289, or to certain provisions of the law, is not presented at this juncture. The motions to supplement the record are denied. The district court's order granting a preliminary injunction is affirmed.
 

 The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.
 

 Citing
 
 City of El Paso v. Simmons
 
 ,
 
 379 U.S. 497
 
 , 508-09,
 
 85 S.Ct. 577
 
 ,
 
 13 L.Ed.2d 446
 
 (1965), and
 
 Manigault v. Springs
 
 ,
 
 199 U.S. 473
 
 , 480-81,
 
 26 S.Ct. 127
 
 ,
 
 50 L.Ed. 274
 
 (1905), the dissent asserts that it is not "difficult" for a State to carry its burden of showing a significant and legitimate public purpose, because there is "wide discretion on the part of the legislature in determining what is and what is not necessary."
 
 Post
 
 , at 735. These decisions, however, refer to discretion in choosing a means to implement a law's purpose
 
 if
 
 the State is properly exercising its police power-
 
 i.e.
 
 , if the law has a significant and legitimate public purpose.
 
 See
 

 Energy Reserves Grp.
 
 ,
 
 459 U.S. at 412
 
 ,
 
 103 S.Ct. 697
 
 ;
 
 Simmons
 
 ,
 
 379 U.S. at 508-09
 
 ,
 
 85 S.Ct. 577
 
 ("
 
 Once we are in this domain of the reserve power of a State
 
 we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary.' ") (emphasis added) (internal quotation omitted).