# United States Court of Appeals
## For the Eighth Circuit

_____

## No. 21-1278
_____

Heights Apartments, LLC

*Plaintiff - Appellant*

Walnut Trails, LLLP

*Plaintiff*

v.

Tim Walz, in his individual and his official capacity as Governor of the State of
Minnesota; Keith M. Ellison, in his individual and his official capacity as Attorney
General of the State of Minnesota; John Doe

*Defendants - Appellees*

------------------------------

American Medical Association; Home Line; Housing Justice Center; Lawyers'
Committee for Civil Rights Under Law; Mid-Minnesota Legal Aid; Minnesota
Assistance Council for Veterans; Minnesota Association of Community Health
Centers; Minnesota Coalition for the Homeless; Minnesota Medical Association;
Southern Minnesota Regional Legal Services; Violence Free Minnesota; Volunteer
Lawyers Network

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 19, 2021
Filed: April 5, 2022
_____

Before GRUENDER, ERICKSON, and STRAS, Circuit Judges.
_____

ERICKSON, Circuit Judge.

On March 23, 2020, Minnesota Governor Tim Walz signed an executive order mandating a statewide residential eviction moratorium. The purpose of the moratorium was to alleviate the displacement of families arising out of the COVID-19 pandemic and loss of employment due to widespread business closures. Governor Walz subsequently issued two additional executive orders amending and extending the residential eviction moratorium for an indeterminate time. Heights Apartments, LLC ("Heights"), a property owner of residential rental units in Minnesota, challenged the executive orders, raising claims under 42 U.S.C. § 1983 for violating rights protected under the Contract Clause, First Amendment, Fifth Amendment, and Fourteenth Amendment of the United States Constitution, and under Minnesota law.[1] The district court granted Governor Walz's motion to dismiss and denied Heights' motion for a preliminary injunction as moot.

While this case's controversy does not require a full exposition of the constitutional limits of a state's police powers during a national emergency like a pandemic, we find that Heights has sufficiently pleaded, at the dismissal stage of the proceedings, claims under the Contract Clause and Takings Clause. We reverse and remand for proceedings consistent with this opinion.

_____

[1]Below, Heights was a co-plaintiff with Walnut Trails, LLLP, another owner of residential properties in Minnesota. Walnut Trails, LLLP did not appeal.

## I.  BACKGROUND

Shortly after Minnesota reported its first confirmed case of COVID-19 in March of 2020, Governor Walz declared an emergency and issued a number of executive orders intended to alleviate the pandemic's effect on Minnesotans.[2] Salient to this case are Executive Orders 20-14,[3] 20-73,[4] and 20-79[5] (collectively, the "EOs"), which placed a moratorium on residential evictions in an effort to "allow households to remain sheltered during the peacetime emergency" and threatened criminal sanctions on landlords who violated the terms.

EO 20-14, signed on March 23, 2020, mirrored, in part, an eviction moratorium established by the federal government.  Under this EO, while not relieving tenants of their rental obligations, landlords in Minnesota could evict tenants only if they "seriously endanger[ed] the safety of other residents" or engaged in illicit activity, as described in Minn. Stat. § 504B.171, subd. 1.  The EO requested, but did not mandate, that financial institutions refrain from foreclosing on landlords' properties if their financial difficulties were related to the COVID-19 pandemic.  The EO contained no end date and made willful violations a misdemeanor punishable by imprisonment or a fine.  It further granted the Minnesota attorney general discretion to impose other penalties on landlords under Minn. Stat. § 8.31 for violations.

---

[2]See Minn. Exec. Order No. 20-01: Declaring a Peacetime Emergency and Coordinating Minnesota's Strategy to Protect Minnesotans from COVID-19 (March 13, 2020).

[3]See Minn. Exec. Order No. 20-14: Suspending Evictions and Writs of Recovery During the COVID-19 Peacetime Emergency (March 23, 2020).

[4]See Minn. Exec. Order No. 20-73: Clarifying Executive Order 20-14 Suspending Evictions and Writs of Recovery During the COVID-19 Peacetime Emergency (June 5, 2020).

[5]See Minn. Exec. Order No. 20-79: Modifying the Suspension of Evictions and Writs of Recovery During the COVID-19 Peacetime Emergency (July 14, 2020).

On June 5, 2020, Governor Walz signed EO 20-73, which clarified that EO 20-14 also allowed the eviction of tenants who "seriously endanger[ed] the safety of others on the premises" of the leased residential property, rather than just the safety of other tenants. Several weeks later, Governor Walz rescinded EOs 20-14 and 20-73, and implemented EO 20-79, which also did not relieve tenants of their rent obligations but continued to prohibit landlords from issuing notices of termination, nonrenewal, or eviction, even for tenants who materially violated a lease term (with limited exceptions, noted below) or failed to pay rent. Governor Walz again strongly urged, but did not require, financial institutions to refrain from foreclosing on landlords' properties or imposing late fees when landlords were unable to meet their mortgage obligations because of the pandemic.

EO 20-79 did not apply to tenants who: (1) seriously endangered the safety of other residents; (2) engaged in illicit activity on the leased premises, as described in Minn. Stat. § 504B.171, subd. 1; (3) remained on the property after receiving a notice to vacate or of nonrenewal, but only when the landlord's family needed to move into the unit and would do so within seven days after the tenant vacated the property; or (4) materially violated the lease by seriously endangering the safety of others or significantly damaging property on the leased premises. In cases where the landlords could evict a residential tenant, they were required to give the tenant a seven-day notice of intent to file an eviction in order to "encourage resolutions without court involvement." EO 20-79 had no effective end date. Criminal sanctions for willful violations by landlords were retained.

Heights entered into a purchase contract for three residential rental properties in Minnesota prior to EO 20-14 and closed on those properties a few days after EO 20-14 went into effect. On September 24, 2020, Heights commenced this action against Governor Walz, in his official and individual capacities, Minnesota State Attorney General Keith Ellison, in his official and individual capacities, and various "John Doe" officials and private persons used to enforce the EOs (collectively, the "Walz Defendants"). Heights alleged the EOs unlawfully prevented it from excluding tenants who breached their leases, intruded on its ability to manage its

-4-

private property, and interfered indefinitely with its collection of rents. Heights sought a declaration that the Walz Defendants violated the United States Constitution, a permanent injunction to prevent enforcement of current or future executive orders that violated the United States Constitution, compensatory damages, attorney's fees, and other fees permitted by law.

The Walz Defendants moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and (b)(6) for lack of subject matter jurisdiction and for failure to state a claim. The district court granted the motion, concluding Governor Walz was entitled to sovereign immunity on the state law claim and that Heights otherwise failed to state a claim entitling it to relief. The district court dismissed the complaint without prejudice and denied Heights' motion for a preliminary injunction as moot. Heights appeals.[6]

After the parties filed their briefs, the Minnesota Legislature voided Governor Walz's EOs and enacted a new eviction moratorium. See Act of June 29, 2021, 2021 Minn. Laws 1st Spec. Sess. Ch. 8, art. 5 (the "Eviction Law"). Under the Eviction Law, residential tenants in Minnesota enjoy protection from eviction for non-payment of rent until June 1, 2022, so long as they have pending applications for rental assistance. Id. The Walz Defendants moved for partial dismissal of the appeal, asserting the Court lacked subject matter jurisdiction over the request for injunctive relief. Heights has opposed the request for dismissal.

## II.    DISCUSSION

### 1.    Jurisdiction

Given Minnesota's new law and its replacement of the EOs, we first address the scope of our jurisdiction. Article III of the Constitution limits our consideration to cases and controversies existing throughout all stages of litigation. Kingdomware

---

[6]Heights does not appeal the dismissal of its *ultra vires* claims.

Techs., Inc. v. United States, 579 U.S. 162, 169 (2016); see U.S. Const. art. III, § 2, cl. 1. We are unable to review Minnesota's Eviction Law because our jurisdiction extends only to live cases and controversies identified within the complaint, and we are without authority to give advisory opinions. See Carney v. Adams, 592 U.S. ____, 141 S. Ct. 493, 498 (2020).

Heights' challenges to the now-voided EOs are moot to the extent they seek to enjoin the EOs and declare them invalid because there is no longer a live controversy since the EOs have been superseded by statute. See N.Y. State Rifle & Pistol Ass'n, Inc. v. N.Y.C., 590 U.S. ____, 140 S. Ct. 1525, 1526–27 (2020) (per curiam) (vacating and remanding after New York amended the challenged statute). Resolution of mootness, however, requires attention to a case's particular circumstances because "even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case." Hawse v. Page, 7 F.4th 685, 692 (8th Cir. 2021) (quoting Tandon v. Newsom, 593 U.S. ____, 141 S. Ct. 1294, 1297 (2021) (per curiam)). Because Heights has requested relief in the form of money damages, we have jurisdiction to consider the merits of its remaining claims. See Uzuegbunam v. Preczewski, 592 U.S. ____, 141 S. Ct. 792, 802 (2021) (holding "that, for the purpose of Article III standing," even a request for "nominal damages provide[s] the necessary redress for a completed violation of a legal right"). We grant the Walz Defendants' motion for partial dismissal and proceed to analyze *de novo* Heights' challenges to the EOs. See Mo. Broads. Ass'n v. Lacy, 846 F.3d 295, 300 (8th Cir. 2017).

## 2.    Standard of Review of the Alleged Constitutional Claims

Some dispute exists as to the proper standard of review regarding Heights' constitutional challenges. The district court, applying In re Rutledge, 956 F.3d 1018 (8th Cir. 2020), determined that the EOs were subject to review under the deferential standard found in Jacobson v. Massachusetts, 197 U.S. 11 (1905). On appeal, Heights asks us to apply the traditional tiers of scrutiny rather than the Jacobson framework. See Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. ____, 141

S. Ct. 63, 67, 69 (2020) (per curiam) (stating New York's COVID-related church attendance restrictions failed strict scrutiny's rigorous review).

Jacobson, although it predated the establishment of the traditional tiers of scrutiny, is not wholly inconsistent with the application of these tiers. See, e.g., id. at 70 (Gorsuch, J., concurring) (stating the Jacobson Court essentially applied rational basis review when it evaluated Massachusetts' law relating to the then-ongoing smallpox pandemic). When this Court decided In re Rutledge, we were in the early days of the pandemic. Much was unknown at that time—governmental leaders were acting on the best information available and needed to move quickly given the nature of the emergency. At a time when local authorities were confronted with a public health crisis that was rapidly developing, poorly understood, and in need of immediate and decisive action, Jacobson seemed to be the best guide for navigating constitutional challenges to emergency public health initiatives. The public health crisis has since evolved, and time is available for more reasoned and less immediate decision-making by public health officials. In addition, the Supreme Court has since given guidance that is instructive regarding our standard of review during public health crises. See, e.g., Chrysafis v. Marks, 594 U.S. ____, 141 S. Ct. 2482 (2021) (enjoining part of New York's COVID-19 Emergency Eviction and Foreclosure Prevention Act due to alleged due process violations without mentioning Jacobson); Tandon, 141 S. Ct. at 1296–97 (applying strict scrutiny to California's restrictions on religious gatherings).

Heights alleges violations of its rights beginning in March 2020. Some of the damages it allegedly suffered likely occurred during the public health crisis when Jacobson deference would be applicable. Some likely occurred after the immediate public health crisis dissipated, and traditional levels of scrutiny are applicable. See Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 65, 70. It is a factual determination left to the district court on remand to resolve when during the pandemic the constitutional lens shifted from Jacobson deference to the modern tiers of scrutiny.

### 3. Heights' Claims

#### A. *The Contract Clause*

Heights alleges a Contract Clause violation pursuant to 42 U.S.C. § 1983. The Walz Defendants have not contested the availability of pursuing such a claim under § 1983. While this Court has not expressly decided whether there is a private right of action under § 1983 for a Contract Clause violation, there have been cases in this circuit in which such a cause of action has been asserted. See, e.g., Justice Network Inc. v. Craighead Cnty, 931 F.3d 753, 758 (8th Cir. 2019) (probation company brought suit against two judges, the county, and the city pursuant to § 1983 for violations of the Contract Clause (U.S. Const. art. 1, § 10), the Takings Clause (U.S. Const. amend. V), and Arkansas Constitution's Takings Clause (Ark. Const. art. II, § 22)); Int'l Ass'n of Fire Fighters, Local 2665 v. City of Clayton, 320 F.3d 849, 850 (8th Cir. 2003) (firefighters sued under 42 U.S.C. § 1983 alleging claims under Article 1, § 10 of the Constitution (Contracts Clause); the Fourteenth Amendment (Due Process Clause); and the Missouri Constitution (impairment of contract)). Courts that have addressed this specific issue have been split. Compare Kaminski v. Coulter, 865 F.3d 339, 347 (6th Cir. 2017) (determining that a Contract Clause violation cannot give rise to a § 1983 cause of action), and Crosby v. City of Gastonia, 635 F.3d 634, 641 (4th Cir. 2011) (same), with S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam) (concluding that a Contract Clause violation can give rise to a § 1983 cause of action).

Although the Supreme Court appeared to suggest initially in Carter v. Greenhow, 114 U.S. 317, 322-23 (1885), that there was no private cause of action under the Contract Clause, the Court has since clarified that Carter was a question about pleading and not about whether the plaintiff could bring a claim under the Contract Clause. See Dennis v. Higgins, 498 U.S. 439, 451 n.9, 451 (1991) (noting the Court has since given the Carter decision "a narrow reading" and holding that the petitioner could bring a Commerce Clause claim under 42 U.S.C. § 1983); Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 613 n.29 (1979) (Carter

-8-

"held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the right secured to him by that clause of the Constitution (the contract clause), to which he had chosen not to resort") (cleaned up).

We assume, without deciding, the uncontested issue of whether a cause of action for a Contract Clause violation may be brought under § 1983. See Watters v. Bd. of Sch. Dirs. of City of Scranton, 975 F.3d 406, 413 (3d Cir. 2020) (assuming without deciding that there is a § 1983 cause of action for Contract Clause violations); Elliott v. Bd. of Sch. Trustees, 876 F.3d 926, 932 (7th Cir. 2017) (declining to take a position on this issue because it "does not affect [the court's] subject matter jurisdiction and the defendants have waived [the] potential defense").

We now turn to the claim as alleged in the complaint. The Contract Clause of the Constitution forbids states from interfering with contractual obligations. U.S. Const. art. I, § 10, cl. 1. Although it once was an absolute ban on state interference, see Sturges v. Crowninshield, 17 U.S. 122, 206 (1819), the prohibition has since diminished and is no longer "the Draconian provision that its words might seem to imply," Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240 (1978). See Melendez v. N.Y.C., 16 F.4th 992, 1016–20 (2d Cir. 2021) (reviewing the jurisprudential evolution of the Contract Clause).

We apply a two-prong test to determine whether a state has impermissibly interfered with a contract: (1) whether the state law substantially impairs a contractual relationship, which takes into consideration "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights," Sveen v. Melin, 584 U.S. ____, 138 S. Ct. 1815, 1821–22 (2018); and (2) if the first prong is met, "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,'" Ass'n of Equip. Mfrs. v. Burgum, 932 F.3d 727, 730 (8th Cir. 2019) (quoting Sveen, 138 S. Ct. at 1822) (internal quotation marks omitted).

We begin our analysis by considering the extent of the impairment alleged by Heights. A state's interference with a minor contractual provision is not a substantial impairment under the Contract Clause. See Sveen, 138 S. Ct. at 1824. In contrast, interference with a crucial contractual right may constitute a substantial impairment. Here, Heights contends the ownership of property subject to a lease involves a number of incidents and rights, which include not only the landlord's right to receive rent but also the "right to exclude" others from the real estate. Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs., 594 U.S. ____, 141 S. Ct. 2485, 2489 (2021) (per curiam).

The right to exclude is not a creature of statute and is instead fundamental and inherent in the ownership of real property. See Cedar Point Nursery v. Hassid, 594 U.S. ____, 141 S. Ct. 2063, 2072 (2021) (stating the "right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property'") (quoting Kaiser Aetna v. United States, 444 U.S. 164, 179–80 (1979)). The common law crime of trespass would be non-existent if the fundamental right to exclude was dependent upon statute. That said, the right to exclude may properly be limited by government regulation under some circumstances. See, e.g., Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 243, 261–62 (1964) (holding that motels may not refuse to rent rooms to patrons on account of their race or skin color under the Civil Rights Act of 1964); Minn. Stat. § 504B.291 (regulating eviction actions for non-payment of rent).

It is axiomatic that a landlord's bargain of receiving rent in exchange for a tenant's possession of the property is greatly diminished if the landlord's right to exclude the tenant is minimal or non-existent. The same is true if other terms of the lease cannot be enforced. Heights alleged that one non-paying tenant operated a car and boat repair shop on its premises in violation of city ordinances, yet Heights contends it had no means to enforce compliance due to the EOs. Other allegations include instances where non-paying tenants permitted unauthorized persons to live in the units, threw raucous parties, and engaged in other behavior such that rent-

paying tenants in adjacent units moved to evade the nuisance. Although these and other alleged violations of the leases (even those unrelated to non-payment of rent) were sufficient to constitute a breach and warranted eviction, termination of the lease, or nonrenewal of the lease, those remedies were unavailable because of the EOs.[7] In sum, Heights alleged that the EOs precluded it from exercising its right to exclude others and regain possession of its premises. Assuming the veracity of the well-pleaded factual allegations, as we must, Heights has plausibly pleaded that the EOs substantially impaired its contractual bargain with its tenants.[8]

We have recognized that an aggrieved party cannot claim that its expectations were disappointed if it was reasonably foreseeable to the party that the government could substantially interfere with its contract. See Burgum, 932 F.3d at 730 (noting the question of whether a contract has been substantially impaired is "akin to a question of reasonable foreseeability"). Notwithstanding the regulations in the residential housing industry, nothing in Minnesota law or Supreme Court precedent would have made the extent and reach of the EOs foreseeable to Heights.

While Governor Walz relied on several statutes as legal authority for the EOs, none provided reasonable notice that landlords' right to exclude would be severely

---

[7]While landlords may bring an action against delinquent tenants for past-due rent, monetary relief obtained against a judgment-proof individual is an illusory remedy, as has been recognized by the Supreme Court. Ala. Ass'n of Realtors, 141 S. Ct. at 2489 (noting eviction moratoriums place landlords "at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery"). The existence of this possible remedy does not nullify well-pleaded allegations of the substantial impairment of other contractual rights.

[8]We find unpersuasive the Ninth Circuit's decision in Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles, 10 F.4th 905, 908–09, 913 (9th Cir. 2021), which concluded that the eviction moratorium there was "likely 'reasonable' and 'appropriate'" under the Contract Clause, because (1) that case pre-dated the Supreme Court's decision in Ala. Ass'n of Realtors, 141 S. Ct. at 2490, and (2) it was decided on a preliminary injunction motion rather than on a motion to dismiss.

-11-

curtailed for an indefinite duration. The relied-upon statutory authority addressed the procedures and legal effects of executive orders, see Minn. Stat. §§ 4.035, subd. 2 & 12.32; emergency powers granted to the governor, see Minn. Stat. §§ 12.02, subd. 1(2) & 12.21, subd. 1; the attorney general's generic power to investigate and punish illegal practices, see Minn. Stat. § 8.31; and potential penalties for violations of emergency orders, see Minn. Stat. § 12.45. Even the statute that granted the governor emergency power to be involved in the "sheltering of persons" was in the context of the governor "cooperat[ing] with" the federal government and other states' governments about the "evacuation, reception, and sheltering of persons." Minn. Stat. § 12.21, subd. 3(7)(vi).

A survey of Supreme Court precedent leads us to the same conclusion that reasonable notice was not provided. Although the Supreme Court's decision in Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 447 (1934), upheld the Minnesota Legislature's temporary interference with mortgagees' rights to foreclose on property during the declared economic emergency, the circumstances of that case were insufficient to provide reasonable notice here. The EOs at issue were exercises of executive power, not legislative authority; they had no definite termination dates, while the legislation in Blaisdell had an explicit end date. See id. at 416. And the law in Blaisdell regulated foreclosures and sales conditioned on the debtor paying some amount to the creditor—not the deprivation of the owner's right to possess his property with no guaranteed compensation. See id. at 416–19. Moreover, even when the Supreme Court has upheld emergency legislative acts that suspended "all possessory remedies" for removing tenants or occupants in possession against Contract Clause challenges, those laws were unlike the EOs because they had both specified end dates and only allowed tenants to remain on the premises if they remained current on an agreed-upon payment schedule, among other conditions. Id. at 440–42 (citing Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 197–98 (1921) (noting New York's emergency law allowed landlords to recover possession in situations where tenants were "holding over and [were] objectionable," landlords wanted to occupy the dwelling themselves or demolish the premises and rebuild, among other provisions); Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242, 243–

44 (1922) (stating New York's emergency law required tenants to pay in order to continue in possession)).

Having found well-pleaded allegations sufficient to satisfy the first prong for a cognizable claim under the Contract Clause, we turn to the second prong—that is, whether the EOs were appropriately and reasonably tailored to further a "significant and legitimate public purpose." Burgum, 932 F.3d at 730 (quoting Sveen, 138 S. Ct. at 1822) (internal quotation marks omitted). As noted by the Supreme Court, courts typically give deference to state executives who are tasked with the responsibility of taking care of the health and safety of their citizens. S. Bay United Pentecostal Church v. Newsom, 590 U.S. ____, 140 S. Ct. 1613, 1613–14 (2020) (mem.) (Roberts, C.J., concurring in denial of application for injunctive relief). "[A]t the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules" set by officials navigating unprecedented situations. Calvary Chapel Dayton Valley v. Sisolak, 591 U.S. ____, 140 S. Ct. 2603, 2605 (2020) (mem.) (Alito, J., dissenting from the denial of application for injunctive relief). Even so, a state's authority to impose restrictions is not unlimited and judicial deference, even in an emergency or a crisis like the COVID-19 pandemic, "does not mean wholesale judicial abdication." Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 74 (Kavanaugh, J., concurring).

State authorities are not vested with unlimited police power to modify contracts. See U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 21–23 (1977). A state's recitation of an important public interest, alone, may not necessarily be sufficient to overcome the Contract Clause's limitation. Id. We need not resolve the specific nature or bounds of the authority afforded state officials to impose restrictions to control the spread of an extraordinarily serious and deadly virus because disposition turns on the narrower question of whether the restrictions imposed were reasonably tailored to address the legitimate governmental interest identified.

Combatting COVID-19 is necessarily an important public purpose. The Walz Defendants contend the EOs were adequately tailored because they furthered the broad purpose of "controlling the spread of COVID-19" by temporarily promoting social distancing, keeping impacted tenants from congregating in homeless shelters, and the like. Heights counters that the EOs practically prohibited all evictions rather than just those logically related to the pandemic's economic hardships.

While the plain language of the EOs demonstrates that they did not condition tenants' eviction protection on making minimum rent payments or establishing any nexus to their COVID-19 status, our assessment must focus on whether the tailoring was reasonable, not necessarily narrow. See Burgum, 932 F.3d at 734. We acknowledge that the particular harms the EOs allegedly imposed on Heights affected its ability to collect rent, to comply with local ordinances, to enforce material terms of the leases, and to seek redress in the courts using the eviction process. We also acknowledge that landlords in the entire State of Minnesota were obligated to house non-paying, employed, healthy, non-quarantining individuals in the same way as unemployed, sick, and quarantining individuals whose predicaments were tied to COVID-19. And we take no issue with the notion that the EOs further an important government purpose.

Still, the EOs must advance that interest in an "appropriate" and "reasonable" way. Burgum, 932 F.3d at 734 (quoting Sveen, 138 S. Ct. at 1822) (noting the second prong requires consideration of whether the restriction is "drawn in an 'appropriate' and 'reasonable' way to advance" the stated governmental purpose). Heights alleged in its complaint other material breaches unrelated to the nonpayment of rent. They include operating a car and boat shop on the premises, holding raucous parties, and creating nuisances that drove other rent-paying tenants to move. These behaviors undermined efforts to combat the COVID-19 virus; yet they were encompassed by the eviction moratoria. These examples identified by Heights demonstrate there was a lack of reasonable tailoring to advance the Governor's public purpose.

-14-

A cognizable Contract Clause claim requires a showing of a substantial impairment in a contractual relationship that is not reasonably tailored to advance a significant and legitimate public purpose. Id. at 730. Given the breadth and impact of the EOs on landlords' rights, as alleged by Heights, the complaint contains sufficient facts to meet the plausibility requirement for the second prong of its Contract Clause claim—that is, the EOs were not reasonably tailored because they imposed broad restrictions requiring landlords to house tenants engaging in material breaches of the lease—some of which undermined efforts to combat the virus—that had nothing to do with the nonpayment of rent. Assuming the verity of the allegations, as we must at the dismissal stage, Heights' well-pleaded allegations state a plausible claim for relief.

## B.    The First Amendment's Petition Clause

The right to access courts has long been a fundamental constitutional right. See BE & K Constr. Co. v. NLRB, 536 U.S. 516, 524 (2002). The United States Constitution ensures that federal and state courts are open to hear grievances, allowing an aggrieved party the opportunity to pursue a remedy for an actual injury. Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 896–97 (1984). The Petition Clause of the First Amendment is one source of this right. U.S. Const. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."). While the Petition Clause appears limited to application in situations where the United States Congress enacts a law affecting court access, it has also been applied where states limit the redress of grievances. See Harrison v. Springdale Water & Sewer Comm'n, 780 F.2d 1422, 1424–28 (8th Cir. 1986) (concluding the plaintiffs sufficiently stated a claim under the Petition Clause when they alleged the city water commission conspired to intimidate and force them to withdraw their complaint by filing a condemnation counterclaim).

The Supreme Court has divided Petition Clause claims into "forward" and "backward" looking claims, i.e., claims that have been delayed only in the short term and may be litigated in the future and other claims that "cannot now be tried . . . no

-15-

matter what official action may be in the future." Christopher v. Harbury, 536 U.S. 403, 413–14 (2002). Heights' Petition Clause claim is backward-looking. Because the EOs have been superseded by statute, Heights has lost the opportunity to evict existing tenants and former tenants who might have vacated the premises but would have otherwise warranted eviction absent the EOs.

To state a plausible claim under the Petition Clause, Heights must identify the claim it wished to bring, the official actions that frustrated its attempt to redress that grievance, and, for a "backward-looking" claim, a remedy exclusively tied to the alleged harm of being unable to have a court adjudicate its claim. See id. at 415. Even assuming Heights' complaint has plausibly alleged official actions frustrated the landlord's ability to bring various eviction actions, it has not identified "a remedy that could not be obtained on an existing claim." Id. at 421. Because the only potential remedy is damages, Heights has not pleaded damages that are somehow unique to its Petition Clause claim—a requirement for a backward-looking claim to survive. See id.; S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs, 725 F.3d 843, 856–58 (8th Cir. 2013) (Gruender, J., concurring). Heights has failed to allege a cognizable Petition Clause claim.

## C.    The Takings Clause

The Fifth Amendment's Takings Clause, which is applicable to the states under the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause protects property owners from both physical and regulatory takings—the "direct appropriation of property" by governmental actors and imposition of "restriction[s] on the use of property that went 'too far.'" Horne v. Dep't of Agric., 576 U.S. 350, 360 (2015) (quoting Penn. Coal Co. v Mahon, 260 U.S. 393, 415 (1922)). In either event, "[t]he government must pay for what it takes." Cedar Point Nursery, 141 S. Ct. at 2071.

-16-

1.      *Per Se* Physical Taking

Heights alleges the EOs effectuated physical takings because they forced landlords to accept the physical occupation of their property regardless of whether tenants provided compensation. The Walz Defendants contend that no physical taking has occurred because landlords were not deprived of their right to evict a tenant. Rather, they argue, the EOs imposed only a restriction on when a landowner could evict a tenant, making it similar to Yee v. City of Escondido, 503 U.S. 519 (1992) (finding a rent control ordinance was not a physical taking). Since the parties briefed this issue, the Supreme Court decided Cedar Point Nursery, which is instructive in this case.

In Cedar Point Nursery, the Supreme Court determined a California regulation requiring agricultural employers to permit "union organizers onto their property for up to three hours per day, 120 days per year" was a *per se* physical taking under the Fifth and Fourteenth Amendments. 141 S. Ct. at 2069, 2072. The Court explained: "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred." Id. at 2072. It is immaterial whether the physical invasion is "permanent or temporary," "intermittent as opposed to continuous," or whether the government is directly invading the land or allowing a third party to do so. Id. at 2074–76.

Cedar Point Nursery controls here and Yee, which the Walz Defendants rely on, is distinguishable. The rent controls in Yee limited the amount of rent that could be charged and neither deprived landlords of their right to evict nor compelled landlords to continue leasing the property past the leases' termination. 503 U.S. at 527–28. The landlords in Yee sought to exclude future or incoming tenants rather than existing tenants. Id. at 530–31. Here, the EOs forbade the nonrenewal and termination of ongoing leases, even after they had been materially violated, unless the tenants seriously endangered the safety of others or damaged property significantly. See 307, 712, 2103 & 3151 LLC v. City of Minneapolis, 27 F.4th 1377, No. 20-3493, slip op. at *3 (8th Cir. Mar. 14, 2022) (noting "an ordinance that

-17-

would require landlords to rent to individuals they would otherwise reject might be a physical-invasion taking"). According to Heights' complaint, the EOs "turned every lease in Minnesota into an indefinite lease, terminable only at the option of the tenant." Heights has sufficiently alleged that the Walz Defendants deprived Heights of its right to exclude existing tenants without compensation. The well-pleaded allegations are sufficient to give rise to a plausible *per se* physical takings claim under Cedar Point Nursery.

## 2. Non-Categorical Regulatory Taking

Heights has also alleged a non-categorical regulatory takings claim. Such a claim is an alternative to Heights' *per se* physical takings claim. Cedar Point Nursery, 141 S. Ct. at 2072 ("Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and Penn Cent. [Transp. Co. v. N.Y.C., 438 U.S. 104, 124 (1978)] has no place."). While both types of takings claims may not ultimately survive, at this stage of the proceedings, our review is limited to plausibility, not claim resolution.

That Heights closed on the properties shortly after the first EO was signed is immaterial to our analysis of the regulatory takings claim. See Palazzolo v. Rhode Island, 533 U.S. 606, 626–28 (2001) (rejecting the argument that a landowner who recently purchases a property with notice that it could be regulated by then-pending, but now effective legislation cannot assert a regulatory takings claim). Heights alleged in its complaint that the EOs constituted non-categorical regulatory takings because they deprived it of the economic and beneficial use and decision-making related to its property and investments. The Walz Defendants contend this claim fails because Heights did not plead facts showing either a diminution in its property value as a whole or a calculation of lost income. The Supreme Court has rejected the Walz Defendants' narrow view when it instructed courts not to "limit the parcel in an artificial manner to the portion of property targeted by the challenged regulation." Murr v. Wisconsin, 582 U.S. ____, 137 S. Ct. 1933, 1944 (2017) (citing Penn Cent. Transp. Co., 438 U.S. at 130). Here, since the EOs affected the lease

-18-

terms of every residential unit (paying or non-paying), the allegedly taken property consists of all of Heights' residential rental property.  See id. at 1944–45.

In determining whether a property use restriction is a "taking" under the Fifth Amendment, we balance three factors: (1) the "economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) the "character of the governmental action."  Penn Cent. Transp. Co., 438 U.S. at 124; see also Cedar Point Nursery, 141 S. Ct. at 2072 (reaffirming Penn Central's "flexible test").  In discerning whether a taking has occurred, the first two factors are the main determinants, and "the third 'may be relevant.'"  Hawkeye Commodity Promotions, Inc. v. Vilsack, 486 F.3d 430, 441–42 (8th Cir. 2007) (quoting Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538–39 (2005)).  The test is designed to "prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"  Palazzolo, 533 U.S. at 618 (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)).

Heights alleged the EOs deprived it of receiving rental income and managing its property according to the leases' terms and Minnesota law.  Also, as the district court noted, no landlord could have reasonably expected regulations of the duration and extent present in the EOs.  Heights sufficiently pleaded the first two Penn Central factors: economic harm and interference with investment-backed expectations.

More dispute surrounds the third factor—the nature of the regulation.  In certain instances, the Supreme Court has found that a regulation's effects are so publicly beneficial that the regulation "does not constitute a taking requiring Government compensation."  Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225 (1986) (collecting cases).  Heights asserts the EOs are not in this category because, in comparison to the legislation discussed in Connolly, the EOs were not as broadly beneficial, and they improperly imposed the public cost of fighting homelessness on a subset of the population: rental property owners.

Accepting the facts pleaded by Heights as true and construing all reasonable inferences in its favor, the EOs are not like the legislation in <u>Connolly</u>. The legislation in <u>Connolly</u> imposed proportional liability on employers when they withdrew from multiemployer pension plans to ensure employers funded their employees' vested pension obligations without leaving the few remaining participating employers to carry others' financial burdens. <u>Id.</u> at 226–28. In contrast, Heights alleged the EOs directly benefitted only some Minnesotans (residential renters) and perhaps incidentally benefitted others by not having more people in homeless shelters. But, as Heights highlights, those benefits were not the same widespread interests created by the pension protection program in <u>Connolly</u>. Additionally, the problem that the legislation in <u>Connolly</u> sought to solve was of a different nature than the issue here. Landlords do not impose their obligations on others when they exclude tenants who materially breach their leases in the same way that employers force others to pay for their own employees' benefits when they withdraw from multiemployer pension plans.

Considering the Supreme Court's recent pronouncement regarding the now-defunct CDC eviction moratorium, we are unconvinced that as a matter of law the EOs are permissible non-compensable takings. As to the CDC eviction moratorium, which had narrower terms than the EOs, the Court noted:

> The moratorium has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery. Despite the [government]'s determination that landlords should bear a significant financial cost of the pandemic, many landlords have modest means. And preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude.

<u>Ala. Ass'n of Realtors.</u>, 141 S. Ct. at 2489.

As Heights alleged, the EOs affected more than the collection of rent from tenants. "Property rights in a physical thing have been described as the rights 'to

possess, use and dispose of it.'" See also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citation omitted). By imposing restrictions on property rights, "the government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." Id. As an alternative to the physical takings claim, Heights has sufficiently alleged that the EOs may constitute a compensable, non-categorical regulatory taking. Among the damages, Heights alleged it was deprived of its expected return on investment in the form of rental income. These alleged damages are sufficient to plausibly give rise to a Fifth Amendment takings claim.

### D.     Due Process under the Fifth and Fourteenth Amendments

Finally, Heights argues it stated a substantive due process claim under the Fifth and Fourteenth Amendments because the amalgamation of the EOs' alleged constitutional violations "interferes with rights implicit in the concept of ordered liberty." The Supreme Court has instructed us to be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). This is especially true where, as here, Heights has alleged violations of various rights that trigger protections under other Amendments to the Constitution. See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702, 721 (2010) (plurality opinion). Heights has failed to plausibly plead a substantive due process violation.

## III.   CONCLUSION

Heights has plausibly pleaded constitutional claims under the Contract Clause and Takings Clause. We reverse the dismissal as to those two claims and remand for proceedings in accordance with this opinion. We affirm the dismissal of Heights' other claims.

_____